# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER ANTHONY YOUNG,** | § | |
| **TDCJ No. 999508,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| **V.** | § | **CIVIL NO. SA-13-CA-500-XR** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| Respondent. | § | |

## ORDER

Petitioner Christopher Anthony Young filed this federal habeas corpus action pursuant to 28 U.S.C. Section 2254 challenging his 2006 Bexar County conviction for capital murder and sentence of death for the fatal shooting of Hasmukh Patel during the course of an attempted robbery. For the reasons set forth below, Petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

## I. Background

A.    <u>The Offense</u>

The Texas Court of Criminal Appeals' published opinion affirming Petitioner's conviction on direct appeal summarized the pertinent evidence introduced at the guilt-innocence phase of Petitioner's capital murder trial as follows:

> The evidence at trial established that on November 21, 2004, within minutes of stealing a red Mazda Protégé from its owner at gunpoint, the appellant drove the stolen vehicle to the mini-mart/dry cleaners owned by Hasmukhbhai Patel. The following events were captured on the store's surveillance camera: FN5 the

appellant, wearing a black shirt and light-colored shorts, entered the store at 9:37 a.m. and appeared to be holding something hidden within his left pocket. The appellant looked around the front of the store before moving behind Patel, who was working in the rear of the store. The appellant asked Patel the cost of cleaning clothes at the store. The appellant's voice immediately changed to a lower tone, and the appellant stated, "Alright [sic], give up the money. I'm not playing. I'm not fucking playing." Patel came into view as he quickly moved behind the counter towards the cash register, and the appellant could be seen leaning over the front counter with his left arm completely extended, pointing a silver handgun at Patel. Again, the appellant ordered Patel to "give up the money," followed by the appellant's firing his first shot in the direction of Patel (now out of view behind the cash register). The appellant then yelled, "You be fucking up. I'm not playing. Give it up!" He fired a second shot in the direction of Patel. At this point, the alarm went off as Patel had apparently pushed the panic button on the system. The appellant, with his handgun still extended, followed the fleeing Patel to the opposite side of the front counter, and he could be heard over the alarm shouting, "I said give up the money, right." The video caught the appellant's movement behind the counter in the direction of the cash register. He was out of view for a few seconds before coming back into view and was then seen concealing his handgun under his shirt as he left the store.

FN5. The surveillance camera provided both audio and video evidence of the crime. The camera also time and date-stamped the film so it evidences the exact timing of the offense.

Two of Patel's regular customers, Raul Vasquez, Jr. and Hattie Helton, happened to be in the parking lot of the store at the time of the offense. Vasquez had just pulled into a parking space in front of the store. Before he could exit his truck, he heard gunshots and looked up to see a black male leaning over the counter firing a gun at Patel. When the gunman left the store and got into a small red car, Vasquez called the police and then chased the gunman, but with no success. Vasquez was able to tell the police that the car's license plate had a "W" and that the perpetrator was wearing a black shirt and light-colored shorts. Helton, who was parked directly in front of the door, had just exited the store moments earlier and was in her car checking her "scratch-off" lottery tickets. When she heard the store alarm go off, she looked up to see a black male exit the store and get in a small red car that was parked by the gas pumps. Once he was gone, Helton exited her car and called to Patel. When he did not answer, Helton called the police on a payphone located outside of the store. Both Vasquez and Helton identified the appellant as the perpetrator at trial.

The appellant was apprehended at approximately 11:00 a.m. when an officer spotted the red car parked at a house several miles away. The car's license plate began with a "W." The appellant was wearing a black shirt and light-colored shorts. The appellant's hands, shirt, and the steering wheel of the car all tested positive for gunshot residue. Patel's blood was found on one of the appellant's socks. Patel died from the gunshot wound to his chest. The murder weapon was never recovered.

*Young v. State*, 283 S.W.3d 854, 860-61 (Tex. Crim. App. 2009), *cert. denied*, 558 U.S. 1093 (2009).

B.     Indictment

On February 13, 2015, a Bexar County grand jury indicted Petitioner on a charge of capital murder, to wit, intentionally causing the death of Patel by shooting Patel with a deadly weapon, namely a firearm, while in the course of committing and attempting to commit the robbery of Patel.[1]

C.     Guilt-Innocence Phase of Trial

The guilt-innocence phase of Petitioner's capital murder trial commenced on January 30, 2006.  On February 1, 2006, after deliberating less than two hours, Petitioner's jury returned its verdict, finding Petitioner guilty of capital murder as charged in the indictment.[2]

D.     Punishment Phase of Trial

1.     The Prosecution's Evidence

The Texas Court of Criminal Appeals' opinion summarized the testimony and other evidence presented during the punishment phase of Petitioner's trial as follows:

> The evidence in the instant case revealed that, immediately after he stole a car from a woman at gunpoint, the appellant drove to Patel's store, demanded money, and then shot Patel dead when Patel did not cooperate quickly enough.  The appellant

---

[1] The indictment returned against Petitioner in Bexar County cause no. 2005-CR-1183 appears among the pleadings, motions, and other documents filed in Petitioner's state trial court proceedings (henceforth "Trial Transcript") at p. 3.  Another copy of Petitioner's indictment also appears among the pleadings, motions, and other documents filed in Petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), at pp. 109, 214.

[2] Verbatim statement of facts reflecting the testimony from Petitioner's trial (henceforth "S.F. Trial"), Volume 14, at pp. 52-55; Trial Transcript. at p. 300.

The court reporter's record from Petitioner's trial reveals the jury retired to deliberate at the guilt-innocence phase of trial at 10:47 AM on February 1, 2006 and returned to the courtroom with its verdict form at 12:34 PM the same date.  It is unclear from the record whether Petitioner's jury took a lunch break during that time frame.

then left the store, disposed of his weapon, and picked up a prostitute with whom he could do drugs.  This evidence of such a callous crime might alone support a finding of future dangerousness.  However, the State presented further evidence that, immediately prior to the instant crime, the appellant also committed aggravated sexual assault on the woman from whom he stole the red Mazda Protégé.

At approximately 8:45 a.m. on November 21, 2004, Daphne Edwards was serving breakfast to her three young girls, all under the age of eight, when she realized that she was out of cigarettes.  Edwards decided to leave her efficiency apartment and quickly drove to Patel's store about one block away while the children were eating.  She was gone less than five minutes.  Upon returning, she parked in front of the apartment and went straight inside.  Almost immediately after her return, there was a knock on her door.  Thinking it was her sister, Edwards opened the door to find the appellant standing there pointing a silver revolver at her.  The appellant put the gun to Edwards' head, pushed his way in and asked her, "Where's the fucking money?"  The appellant walked Edwards through the apartment at gunpoint to make sure no one else was home other than the children and that there was no access to a phone.  The three children were scared and crying.  Edwards gave the appellant all the money that she had in her purse—$28—but he told her that she had to give him something else because that was not enough money.  The appellant then told Edwards to undress.  He had Edwards tell her girls to go to the other room; however, as it was an efficiency apartment the girls could still see and hear everything that happened.  The appellant then told Edwards that she was not disrobing quickly enough, so he shot the gun into the floor next to her feet.  Edwards disrobed, and the appellant made her sit in a chair and perform oral sex on him.  The appellant then made Edwards walk to the bathroom where the children could not fully see what was happening but the appellant could see the children.  The appellant then made Edwards get on her knees and perform oral sex on him again. FN25  The appellant then decided that he wanted Edwards to wear something "sexy" for him, so he took her back out of the bathroom to get her clothes.  Edwards picked out an outfit but the appellant thought it was too long, so she picked out another outfit.  He made her put on this outfit but did not allow her to put on any underwear.  The appellant then decided that he wanted to leave.  When Edwards protested that she would not leave her children, the appellant told her, "You did it before. I saw you."  The appellant then walked over to the children and kissed each of them on the cheek and told them that their mommy would be back.

FN25. DNA tests confirmed the sexual assault by the appellant.

The appellant then forced Edwards, still at gunpoint, to leave the apartment and get into her red Mazda Protégé.  He had her drive to the front of the apartment complex, at which point he decided that he wanted to drive.  As he was getting out of the car, he told Edwards not to drive off or he would go back and kill her children.  He told her to move to the passenger seat.  As he was getting into the driver's seat, Edwards took the opportunity to escape—the appellant had left the passenger door

open and Edwards saw some people in the parking lot.  She ran screaming to her cousin's apartment at the front of the complex where they called the police and then went to get the children.  The appellant drove off in Edwards' car.

In addition to this evidence, the State also presented the appellant's previous convictions for possession of marijuana, evading arrest, and three assaults with bodily injury, two involving injury to his mother when he was a juvenile.  The third assault occurred in September 2004 and involved his girlfriend, Chala Riley, who was eight-months pregnant at the time.  In order to stop the assault, Riley lied and told the appellant that she was going into labor.  Further, the night before the instant offense, the appellant accosted the same girlfriend after she informed him that she was permanently breaking off their relationship.  The appellant pulled her out of her car, beat her, and then took her car, purse, and cell phone.  Other evidence showed that the appellant shot at another person in a parking lot on May 9, 2004, but charges were never filed.[3]

*Young v. State*, 283 S.W.3d at 863-65.

## 2.    The Defense's Evidence

The mother of one of Petitioner's two daughters testified in pertinent part that (1) she lived with Petitioner for about three years before the birth of their daughter in June, 2004, (2) she had a good relationship with Petitioner but was not living with him on the date of Petitioner's arrest, (3) the murder of Petitioner's father when Petitioner was a child "just didn't settle right with him," (4)

---

[3] At the punishment phase of Petitioner's trial, when called to testify by the prosecution, Chala Riley, the mother of Petitioner's younger daughter, testified, in pertinent part, she and Petitioner had a daughter who was born September 26, 2004.  S.F. Trial, Volume 16, testimony of Chala Riley, at p. 139.  Ms. Riley also testified about (1) an incident on May 9, 2004 when she was living with Petitioner in which Petitioner saw a person named "C-Smalls drive past their apartment, Petitioner said he was going to get C-Smalls.  Petitioner then obtained a gun and left the apartment, she heard multiple shots soon thereafter, and, when he returned to their apartment, Petitioner told her he had shot at C-Smalls, (2) an incident on September 12, 2004, two weeks before the birth of their daughter, in which Petitioner grabbed her when she came to the door of the home where she was staying, pulled her out of the home after grabbing her shirt and neck, punched her a couple times, pushed her up against a car, dragged her down the street, threw her into a ditch, stopped punching her only after she informed him that her water had broken and she was in labor, and she remained so frightened of Petitioner when police arrived she was initially unable to tell the police what Petitioner had done to her until she was safely inside an ambulance the police had summoned to treat her injuries and the EMT closed the door behind them, and (3) an incident which occurred November 20, 2004, the night before Patel's murder, in which Petitioner pulled her from the driver's seat of a car, punched her, threatened to kill her, and drove off in the car with her purse, wallet, and cell phone.  S.F. Trial, Volume 16, testimony of Chala Riley, at pp. 138-66.  Ms. Riley also testified she and Petitioner had been in Patel's store on multiple occasions, Petitioner had used Patel's store's cleaning services, and Petitioner knew Patel.  *Id.*, at p. 143.

Petitioner's father's death deeply affected Petitioner, and (5) Petitioner became depressed whenever he talked about his father.[4]

Petitioner's step-father testified (1) he had known Petitioner since Petitioner was eighteen years old, (2) Petitioner would never talk about his father or his father's murder, (3) the death of Petitioner's father was "an empty spot in his life," (4) he tried to serve as a role model for Petitioner and to instill family values in Petitioner, (5) Petitioner got along well with his siblings, (6) Petitioner had a lot of problems which Petitioner kept bottled up inside him, (7) Petitioner always treated him with respect, (8) Petitioner would never open up about what was troubling him, and (9) he had never seen a mean streak in Petitioner or Petitioner drunk.[5]

Petitioner's grandmother testified (1) Petitioner's father - Willard Floyd Young - was murdered on Martin Luther King Day less than an hour after he returned Petitioner and Petitioner's sister to their residence after taking them to the MLK Day March, (2) Petitioner was eight years old at the time of his father's murder and, up to that point, was a normal eight year old - polite, respectful of others, and liked school, (3) after Willard's murder, she did not see much of Petitioner for several years as Petitioner lived with his aunt Velina, (4) Petitioner came to live with her and her husband when Petitioner was fifteen after Petitioner went to juvenile court and began to have problems with his mother, (5) Petitioner worked at Dollar Bills Detail Shop starting when Petitioner was fifteen or sixteen, (6) Petitioner got along fine with the rest of their family, managed his money well, and seemed to enjoy attending Roosevelt High School, (7) Petitioner did not like Madison High School

---

[4] S.F. Trial, Volume 17, testimony of LaKristol Dilworth, at pp. 134-37. On cross-examination, Ms. Dilworth admitted her daughter was born approximately tow-to-three months before petitioner's other daughter was born to petitioner and Chala Riley. *Id.*, at p. 138.

[5] S.F. Trial, Volume 17, testimony of David Johnson, at pp. 139-47.

when he went to live with his aunt Velina, (8) Petitioner never used crude or loud language, never

fought, and (9) she never expected Petitioner to rob or kill anyone.[6]

Petitioner's aunt testified (1) Petitioner's father was a high school graduate and chef, (2)

Willard was thirty years old when he was murdered, (3) she was around Petitioner daily when

Petitioner was a boy, (4) as a boy, Petitioner was out-going, close to his family, and got along well

with his family, (5) Petitioner's father was shot, taken from his car, and laid out in the street with his

arms crossed, (6) the murder of Petitioner's father was never solved which weighed heavily upon

Petitioner, (7) the day of Willard's murder, Petitioner and his sister went to the MLK Day march

with Willard, (8) Willard was killed less than an hour after dropping off Petitioner and Petitioner's

sister, (9) Petitioner came to live with her for about two months after Willard's murder, (10)

Petitioner would cry at night and wake up screaming, (11) Petitioner's mother did not get Petitioner

any counseling despite her suggestions that she do so, (12) Petitioner still breaks down on family

visits to the cemetery, (13) the death of Willard was very rough on Petitioner, (14) after Willard's

murder, Petitioner began having problems at school when other students commented on the death

of his father, (15) Petitioner grew frustrated and no longer wanted to attend school, (16) shortly after

the death of his father, Petitioner's older sister was sexually assaulted on the way home from school

and a subsequent medical examination revealed she was several months pregnant, (17) the ensuing

investigation revealed Petitioner's first step-father, Clarence Franklin, had molested and impregnated

Petitioner's older sister, (18) this led to Franklin's arrest and imprisonment, (19) Petitioner and his

mother had fought with, and been assaulted by, Franklin, (20) Petitioner did not attend his father's

funeral and never accepted Willard's tragic death, (21) Petitioner loved to be around kids and was

_____

[6] S.F. Trial, Volume 17, testimony of Cherlye Benson, at pp. 147-60.

attempting to obtain custody of one of his daughters at the time of Patel's murder, and (22) she feels Patel's murder was wholly at odds with the Christopher she knows.[7]

Petitioner's mother testified (1) she never married Petitioner's biological father, (2) she was seventeen when she gave birth to Petitioner, (3) Petitioner loved his father Willard, (4) Petitioner was eight years old when Willard was murdered, less than an hour after Willard dropped off Petitioner and his sister Charlotte following their participation in the MLK Day march, (5) Willard's murder affected Petitioner "really bad," (6) Petitioner has not accepted Willard's murder at all, (7) Petitioner began having problems at school because of Willard's murder when other students commented about Willard's murder, (8) Petitioner was angered by other students' comments, (9) Petitioner's attitude toward school changed after Willard's murder, (10) Petitioner's attitude toward school went downhill after the murder, (11) Petitioner became frustrated, bitter, and no longer wanted to go to school, (12) Petitioner did not attend his father's funeral and tends to keep things bottled up inside him, (13) shortly after the murder of Petitioner's father, it was discovered that her husband, Clarence Franklin, had sexually assaulted and impregnated Petitioner's older sister Tasha, who was thirteen at the time, (14) Tasha's pregnancy was discovered when she was abducted and raped on her way home from school and Tasha was taken to the hospital for a sexual assault examination, (15) Petitioner did not adjust well to Tasha's sexual assault - blaming his mother for bringing Clarence Franklin into their lives, (16) Petitioner became even more bitter, (17) after Tasha's rape, Petitioner's behavior went even further downhill, (18) Petitioner didn't want to go to school, wouldn't talk to anyone, and kept everything bottled up inside him, (19) Petitioner never had a father figure in his life after Willard's death, (20) she could not believe when she heard Petitioner had shot and killed

_____

[7] S.F. Trial, Volume 17, testimony of Velina Thomas, at pp. 162-74.

someone, (21) she knew Petitioner had experimented with marijuana but not that he had used other drugs, (22) Petitioner bonded well with her second husband, David Johnson, (23) she still has faith in her son, who told her he is very remorseful for what happened to Patel, and (24) she spoke with Petitioner on the phone the night before Patel's murder and Petitioner was having trouble controlling his anger over problems he was having with one of his girlfriends.[8]

The defense called Dr. Paul A. Kern, a psychologist, who testified (1) he evaluated Petitioner in March, 1999 at the request a Bexar County juvenile probation officer, (2) he learned Petitioner experienced suicidal ideation following the death of his father, (3) Petitioner's uncle is serving a 50-year sentence for murder, (4) after evaluating Petitioner, he recommended that (a) Petitioner continue residing with his aunt, (b) Petitioner be evaluated by a psychiatrist to determine if medications might be available to help Petitioner deal with his anger and other emotional problems, © Petitioner receive substance abuse counseling and individual therapy for anger management, family counseling, and behavioral management training, (d) Petitioner receive remedial training in reading and spelling, independent living skills, vocational training, and an eye examination, and (e) Petitioner participate in therapy to explore issues surrounding Petitioner's father's death, (5) Petitioner knows right from wrong and the consequences of doing wrong, (6) Petitioner never indicated he intended to go through with the suicidal thoughts he had at ages twelve and thirteen, and (7) Petitioner indicated he had never been sexually or physically abused.[9]

---

[8] S.F. Trial, Volume 18, testimony of Dannetta Johnson, at pp. 41-63.  Mrs. Johnson testified on cross-examination that, despite her many visits to see Petitioner at the Bexar County Jail, Petitioner had not discussed Patel's murder with her because he claimed he could not remember it.  *Id.*, at p. 63.

[9] S.F. Trial, Volume 18, testimony of Dr. Paul A. Kern, at pp. 8-21.

The defense also called Dr. Brian P. Skop, a forensic psychiatrist, who testified (1) he had evaluated Petitioner in January, 2006,[10] (2) he identified two very serious incidents which occurred when Petitioner was eight years old as having shaped Petitioner emotionally - the murder of Petitioner's father and the arrest of Petitioner's step-father for raping Petitioner's sister, (3) prior to those two incidents, Petitioner was pretty well adjusted and had done fairly well in school, (4) after those incidents, Petitioner's behavior declined substantially, his grades deteriorated, and Petitioner was involved in a lot of altercations at school and had a lot of difficulty adjusting, (5) Petitioner's father's death left a serious void in Petitioner's life, (6) as a result of the foregoing, Petitioner suffered arrested emotional development - an inability to move forward emotionally, (7) essentially, Petitioner is emotionally blocked, i.e., tends to lose his temper, doesn't know how to deal with a stressful situation, and suffers from an inability to move beyond that stage of his life emotionally, (8) Petitioner is angry at the world and does not trust anyone, (9) Petitioner became involved with drugs to escape from the feelings of anger and distrust which overwhelm him, (10) Petitioner displays anger, moodiness, and depression, (11) Petitioner's father's murder was very traumatic for petitioner, (12) the rape of Petitioner's sister only made a bad situation even worse, (13) Petitioner lost another male role model when his step-father was arrested, (14) Petitioner reported he had consumed fifteen to twenty alcoholic drinks within twelve hours of the morning of November 21, 2004, (15) Petitioner reported he smoked crack cocaine the morning of Patel's murder, (16) Petitioner also reported using marijuana, both the evening before and the morning of Patel's murder,

---

[10] Dr. Skop testified he conducted a two and a half hour clinical interview of Petitioner. talked with Petitioner's mother on the phone, reviewed Dr. Kern's report from 1999, and spoke with an attorney who was involved in a child custody case involving one of Petitioner's daughters.  S.F. Trial, Volume 18, testimony of Dr. Brian P. Skop, at pp. 24-25.

(17) Petitioner also suffered from alcohol intoxication the morning of the murder, which led tp loss of control, increased anger, and impulsive behavior, (18) marijuana use causes impaired judgment, and (19) cocaine use causes paranoia, aggressive behavior, increased agitation, and impaired judgment.[11]

3.      Punishment Phase Verdict

On February 7, 2006, after deliberating less than four hours, Petitioner's jury returned its verdict, finding unanimously (1) beyond a reasonable doubt there was a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence be imposed.[12]

E.      Direct Appeal

---

[11] S.F. Trial, Volume 18, testimony of Dr. Brian P. Skop, at pp. 22-31.  On cross-examination, Dr. Skop admitted (1) Petitioner did not mention any violence between himself and his step-father, (2) he did not discuss the sexual assault which occurred prior to Patel's murder with Petitioner, (3) Petitioner admitted he did not perceive any effect his cocaine use had on his conduct, (4) he assumed Petitioner was intoxicated on the morning of November 21, 2004, but the only evidence of Petitioner's alcohol or drug abuse came from Petitioner himself, (5) Petitioner has problems with his anger and tends to ally himself with angry people, and (6) poor impulse control and alcohol make for a bad combination because alcohol worsens the condition.  *Id.*, at pp. 31-40.

[12] S.F.Trial, Volume 18, at pp. 116-20; Trial Transcript, at pp. 320-23.

Petitioner appealed his conviction and sentence.[13]  In an opinion issued April 22, 2009, the

Texas Court of Criminal Appeals affirmed Petitioner's conviction and sentence.  *Young v. State*, 283

S.W.3d 854 (Tex. Crim. App. 2009), *cert. denied*, 558 U.S. 1093 (2009).[14]  The United States

Supreme Court denied Petitioner's petition for writ of certiorari on December 14, 2009.

F.       State Habeas Corpus Proceeding

Petitioner filed his application for state habeas corpus relief on September 25, 2009,

presenting twenty claims for relief.[15]  The state trial court held an evidentiary hearing on Petitioner's

---

[13] In his appellant's brief, filed June 8, 2004, Petitioner's appellate counsel argued (1) there was insufficient evidence showing Patel's murder occurred during the course of a robbery, (2) the evidence was factually insufficient to show Patel's murder occurred during the course of a robbery, (3) the prosecution improperly employed peremptory strikes to remove three African-Americans from the jury on racial grounds, (4) the trial court erred in denying defendant's motion to suppress evidence seized during Petitioner's arrest because Petitioner was arrested in violation of federal law, the Texas Constitution, and Texas statutes, (5) the trial court erred in denying Petitioner's motion to suppress evidence obtained from Petitioner's socks and shoes, (6) the trial court erred in admitting photographs taken during Patel's autopsy which were prejudicial and cumulative of other evidence, (7) the trial court erred in denying Petitioner's request for an instruction at the guilt-innocence phase of trial on the lesser-included offense of murder, (8) there was insufficient evidence supporting the jury's affirmative answer to the future dangerousness special issue, (9) the trial court erred in admitting evidence at the punishment phase of an extraneous shooting incident, (10) the trial court erred in denying Petitioner's motion for mistrial at the punishment phase of trial, and (11) the trial court erroneously failed to give the mandated statutory instruction at the punishment phase of trial informing the jurors they need not agree unanimously as to what evidence warranted an answer favorable to the defense on the mitigation special issue.

Significantly, in his appellant's brief, Petitioner complained that the prosecution's use of peremptory strikes against three African-American female members of the jury venire, i.e., Geneva Nealy Johnson, Myrtlene Anderson Williams, and Paulette Childress, were based upon improper racial considerations and, therefore, violated the principle announced by the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79 (1986).  *Appellant's Brief*, at pp. 37-54.  At no point in his Appellant's Brief did Petitioner argue the prosecution's real reason for striking any of these three venire members was anything other than their ethnicity.  Petitioner never argued in his Appellant's Brief that the prosecution had engaged in any improper consideration of the religion or religious affiliation of any of these three venire members.

[14]The Texas Court of Criminal Appeals rejected on the merits all of Petitioner's *Batson* claims, finding the prosecution had furnished the trial court with *race-neutral* reasons for peremptorily striking venire members Johnson, Williams, and Bell.  *Young v. State*, 283 S.W.3d at 865-71.

[15] State Habeas Transcript, at pp. 1-104.

As grounds for relief, Petitioner's state habeas counsel argued (1) Petitioner's trial counsel rendered ineffective assistance under both federal and state law by (a) failing to request a jury instruction at the punishment phase of trial pursuant to Article 37.071, §2(f)(3) of the Texas Code of Criminal Procedure informing the jurors they need not unanimously agree on which mitigating evidence warranted a finding favorable to the defense on the mitigation special issue, (b) failing to request a jury instruction at the guilt-innocence phase of trial on the lesser-included offense of felony murder, (c) failing to investigate whether the fatal bullet went through Patel's hand and ricocheted off the floor before

12

state habeas corpus application on October 4, 2012.  Petitioner's state habeas counsel presented

testimony from petitioner's lead trial counsel, a mitigation specialist, Petitioner's mother,

Petitioner's older sister Tasha, and Petitioner's aunt Velina.[16]  In an Order issued November 28,

---

striking Patel in the chest, (d) failing to have a forensic expert examine the fatal bullet to see if it passed through Patel's hand before striking the floor and then entering Patel's chest, (e) failing to voir dire the jury venire on the difference between capital murder and felony murder, (f) failing to challenge the legality of petitioner's arrest, (g) failing to object to the admission of evidence defense counsel had previously contested, and (h) failing to investigate possible mitigating evidence, including evidence showing Ppetitioner suffered from Attention Deficit Disorder, asthma, dyslexia, the effects of post-traumatic stress disorder, organic brain damage due to prolonged drug abuse.

Petitioner's state habeas counsel also argued:  (1) the trial court erroneously failed to instruct the jury at the punishment phase of trial in accordance with Article 37.071, §2(f)(3) of the Texas Code of Criminal Procedure that the jurors need not unanimously agree on which mitigating evidence warranted a finding favorable to the defense on the mitigation special issue, in violation of Due Process principles, (2) Article 44.251(A) when read in conjunction with Article 37.071, §2(e) is facially unconstitutional under the Eighth and Fourteenth Amendments to the U.S. Constitution, (3) Due Process principles require appellate review of the proportionality of capital sentences, (4) the Texas statutory definition of "mitigating evidence" is unconstitutionally narrow because it is limited to evidence which reduces a defendant's moral blameworthiness, (5) the Texas capital sentencing scheme's mitigation special issue is facially unconstitutional because it is open-ended in nature, (6) the Texas capital sentencing scheme's mitigation special issue fails to place the burden on the prosecution to disprove the existence of mitigating evidence warranting a life sentence, (7) the death penalty is unconstitutional under the U.S. Constitution and the Texas Constitution, and (8) the Texas capital sentencing scheme is unconstitutional because (a) it forces juries to continue deliberating even after a juror votes to answer a special issue in a manner favorable to the defense and (b) the jurors are not advised of the effect of a single holdout juror.

[16] During the hearing held October 12, 2012 in Petitioner's state habeas corpus proceeding. attorney Michael J. Sawyer testified, in pertinent part, (1) the defense team's mitigation specialist, Ms. Linda Tussay, thoroughly investigated Petitioner's background and helped identify potential mitigating evidence and areas which needed further inquiry, (2) he was aware Petitioner had ADD but not aware that Petitioner had dyslexia, (3) Petitioner had no intellectual problems and was able to communicate fully with the defense team, (4) Petitioner did have problems controlling his aggressive behavior, (5) at the punishment phase of Petitioner's trial, the defense focused on the unsolved murder of Petitioner's father as a very important factor in Petitioner's development, (6) his impression was that the rape of Petitioner's sister had not been as traumatic for Petitioner as had the murder of Petitioner's father, (7) the defense presented evidence showing Petitioner's murder of Patel and the kidnap-rape earlier the same date had been committed while Petitioner was under the influence of crack cocaine, which Petitioner had indicated was his drug of choice, (8) he simply forgot to request a jury instruction regarding the non-unanimity of mitigating evidence warranting an answer favorable to the defense on the mitigation special issue.  Statement of Facts from the evidentiary hearing held October 4, 2012 in Petitioner's state habeas corpus proceeding (henceforth "S.F. State Habeas Hearing") [found at State Habeas transcript, at pp. 287-386], testimony of Michael J. Sawyer, at pp. 6-17.  On cross-examination, attorney Sawyer testified (1) during voir dire and jury argument, the defense argued the jury could consider anything it wished as mitigating evidence, (2) the punishment phase jury instructions directed the jury to consider all the evidence before it, (3) nothing in the punishment phase jury instructions informed the jury it had to unanimously agree on which mitigating evidence warranted a life sentence, (4) both of the mental health experts and most of the family members called by the defense to testify at the punishment phase of trial emphasized the unsolved murder of Petitioner's father and the rape of Petitioner's sister had significantly impacted Petitioner's development, (5) the defense also emphasized the Petitioner was under the influence of drugs at the time of the capital offense, (6) Petitioner was always very articulate and able to communicate with the defense team and clearly working at a good level intellectually,  (7) Petitioner lost composure when he spoke about his father's murder, and (8) he discussed the possibility of Petitioner testifying at trial with

13

2012, the state trial court set forth its findings of fact, conclusions of law, and recommendation that

Petitioner's application for state habeas corpus relief be denied.[17]  On June 5, 2013, the Texas Court

of Criminal Appeals issued an Order in which it (1) held Petitioner had procedurally defaulted on

---

Petitioner but Petitioner indicated he did not wish to testify.  *Id.*, at pp. 18-33, 37.  On re-direct examination, attorney Sawyer testified (1) he never had Petitioner screened for mental retardation and (2) he discussed the possibility of asserting a post-traumatic stress syndrome defense at the guilt-innocence phase of trial with an expert but decided not to use it because it could not be used effectively as a defense.  *Id.*, at pp. 33-36.

Petitioner's mother testified (1) Petitioner had a normal childhood until his father's murder when Petitioner was six years old, which was traumatic for both Petitioner and his entire family, (2) Petitioner was diagnosed with dyslexia and ADD in the seventh grade, which inhibited Petitioner's ability to read and write, and (3) no one offered counseling to her or Petitioner when Petitioner was a juvenile.  S.F. State Habeas Hearing, testimony of Dannetta Johnson, at pp. 40-53.

Petitioner's aunt testified (1) Petitioner was eight years old when his father was murdered, (2) Petitioner became frustrated when Petitioner watched a Crime Stopper's re-enactment of his father's murder, (3) Petitioner attended his father's wake but not his father's funeral, (4) Petitioner stayed with her for a few months after his father's murder and had nightmares, and (5) Petitioner worked at a car wash that fronted for a drug dealer beginning at age seventeen or eighteen.  S.F. State Habeas Hearing, testimony of Velina Thomas, at pp. 54-59.

Petitioner's older sister testified (1) she was very close to Petitioner, (2) she was raped by their stepfather, (3) Petitioner reacted very negatively to the murder of their father and to her rape, (4) Petitioner became withdrawn, violent, and dropped out of school, (5) Petitioner became violent toward their mother, (6) Petitioner observed violence in their home between their mother and their stepfather. (7) Petitioner became angry over this violence, (8) Petitioner also became very protective and controlling, (9) she was living in Milwaukee, Wisconsin at the time of Petitioner's trial, (10) because of complications with her pregnancy, she was unable to travel to attend Petitioner's capital murder trial, and (11) nonetheless, she wrote to Petitioner's trial counsel and offered to help.  S.F. State Habeas hearing, testimony of Tasha Ferguson, at pp. 60-71.

Linda Tussay testified (1) she was the court-appointed mitigation specialist for the defense, (2) she suggested to Petitioner's counsel that Petitioner should be evaluated for post-traumatic stress, (3) she did not believe it necessary to evaluate Petitioner for mental retardation, (4) not all of Petitioner's educational and school records were available to the defense team because Petitioner had attended so many schools and many of his school records had been destroyed by the time of trial, (5) she helped prepare the defense's witnesses at the punishment phase of trial, but (6) she was not present for the testimony of Dr. Kern or Dr. Skop and was unaware of the contents of their testimony or the nature of their evaluations of Petitioner.  S.F. State Habeas Hearing, testimony of Linda Tussay, at pp. 71-93.

[17] State Habeas Transcript, at pp. 389-422. The state trial court concluded (1) the failure of Petitioner's trial counsel to object to the absence of the instruction contained in Article 37.071, §2(f)(3) from Petitioner's punishment phase jury instructions did not prejudice Petitioner within the meaning of *Strickland v. Washington*, (2) Petitioner's complaint about the trial court's failure to instruct the jury per Article 37.071, §2(f)(3) had been rejected on the merits during Petitioner's direct appeal and could not be re-litigated in Petitioner's state habeas corpus proceeding, (3) Petitioner presented no new evidence to support his complaints of ineffective assistance at the punishment phase of trial as all the "new" mitigating evidence presented during the state habeas corpus proceeding had already been presented during Petitioner's capital murder trial, (4) the Texas Court of Criminal Appeals concluded on direct appeal there was reasonable suspicion and probable cause for Petitioner's arrest, therefore, Petitioner's complaints about his trial counsels' failure to challenge the legality of Petitioner's arrest did not satisfy the prejudice prong of *Strickland* analysis, and (5) Petitioner's remaining claims, i.e., Petitioner's challenges to the Texas capital sentencing scheme, both facially, and as applied to Petitioner's case, had previously been rejected on the merits by the Texas Court of Criminal Appeals and did not warrant state habeas corpus relief.  *Id.*

14

most of his challenges to the Texas capital sentencing scheme, (2) adopted the findings and conclusions of the trial court, and (3) denied relief on the merits with regard to all of Petitioner's claims. *Ex parte Christopher Anthony Young*, WR-70,513-01, 2013 WL 2446428 (Tex. Crim. App. 2013).

G.      Proceedings in this Court

Petitioner filed his original federal habeas corpus petition in this action on March 18, 2014 (ECF no. 22).  In his original petition, he urged as grounds for relief arguments that (1) the prosecution's use of a peremptory strike against venire member Myrtlene Williams was based upon her religious affiliation and violated petitioner's rights under the Fourteenth Amendment's Due Process Clause, the Equal Protection Clause and the First Amendment, (2) the prosecution's use of a peremptory strike against venire member Paulette Bell violated both Petitioner's and Ms. Bell's rights because her strike was based, at least in part, on racial factors, (3) Petitioner's trial counsel rendered ineffective assistance by failing to conduct a reasonable sentencing phase investigation, which would have shown (a) Petitioner's mother abandoned petitioner and created dangerous living conditions for Petitioner and his siblings and (b) the murder of Petitioner's father and rape of Petitioner's sister had a devastating effect upon petitioner, and (4) the state trial court violated Petitioner's Eighth Amendment rights by failing to instruct the jury that the jurors need not agree on what particular evidence they found to be mitigating.

Petitioner then filed his first amended petition on May 16, 2014 (ECF no. 32), asserting therein a host of new grounds for relief.  Petitioner's first amended petition contained arguments that (1) the prosecution's use of a peremptory strike against venire member Myrtlene Williams was based upon her religious affiliation and violated petitioner's rights under the Fourteenth Amendment's Due

15

Process Clause, the Equal Protection Clause and the First Amendment, (2) the prosecution's use of a peremptory strike against venire member Paulette Bell violated both Petitioner's and Ms. Bell's rights because her strike was based, at least in part, on racial factors, (3) the trial court's punishment phase jury instructions failed to instruct the jury that a single holdout juror could force the trial court to impose a life sentence under Texas law, in violation of the Supreme Court's holding in *Simmons v. South Carolina*, (4) the trial court violated Petitioner's rights by failing to instruct the jury that the jurors need not unanimously agree on which particular evidence warranted an answer favorable to the defense on the mitigation special issue, (5) Petitioner's trial counsel rendered ineffective assistance by failing to conduct a reasonable sentencing phase investigation, which would have shown (a) Petitioner's mother abandoned Petitioner and created dangerous living conditions for Petitioner and his siblings and (b) the murder of Petitioner's father and the rape of Petitioner's sister had a devastating effect upon Petitioner, and (6) Petitioner's trial counsel rendered ineffective assistance by failing to object to the absence of an instruction pursuant to Article 37.071, §2(f)(3) in the punishment phase jury instructions.

On June 27, 2014, more than three weeks after the expiration of the AEDPA's one-year statute of limitations, Petitioner filed his second amended federal habeas corpus petition mistitled Petitioner's "First Amended Petition for a Writ of Habeas Corpus (ECF no. 39). As grounds for relief, Petitioner presented all of the same claims he raised in his actual first amended petition and added a new claim, to wit, an argument that his trial counsel rendered ineffective assistance in connection with the punishment phase of the capital murder trial by failing to conduct a proper investigation into Petitioner's background and present evidence showing Petitioner suffers from "post-traumatic stress disorder severe type with complex PTSD."

16

On July 16, 2014 (ECF no. 41), Respondent filed his answer to Petitioner's second amended petition and argued, in part, that (1) Petitioner procedurally defaulted on his *Batson* claim regarding venire member Myrtlene Williams by failing to present this new claim to any state court, i.e., this claim is unexhausted and procedurally barred, (2) Petitioner's *Batson* claims involving venire members Williams and Bell are barred by the non-retroactivity doctrine announced in *Teague v. Lane*, (3) Petitioner's complaint about his punishment phase jury instructions premised upon *Simmons v. South Carolina* is unexhausted, procedurally defaulted, and foreclosed by both longstanding Fifth Circuit precedent as well as the Supreme Court's holding in *Teague v. Lane*, (4) the juror affidavits submitted by Petitioner in support of several of his claims herein are inadmissible under Fed. R. Evid. 606(b), (5) Petitioner's complaints about the absence of an instruction pursuant to Article 37.071, §2(f)(3) from his punishment phase jury instructions is foreclosed by the Supreme Court's holding in *Smith v. Spisak*, (6) Petitioner may not present new factual and legal theories in support of the ineffective assistance claims rejected on the merits in the course of Petitioner's state habeas corpus proceeding because to do so renders those claims unexhausted and procedurally defaulted, (7) Petitioner may not present new affidavits and other additional evidence in support of his exhausted ineffective assistance claims because to do violates the Supreme Court's holding in *Cullen v. Pinholster*, and (8) Petitioner's ineffective assistance claims, both those exhausted and unexhausted, do not satisfy the prejudice prong of *Strickland* analysis.

On August 6, 2014 (ECF no. 43), Petitioner filed a reply and argued, in pertinent part, that (1) the *Batson* claim involving venire member Myrtlene Williams is exhausted and not *Teague*-barred, (2) the new affidavits and other documents are not barred from federal habeas review under Rule 606(b) or *Pinholster*, (3) *Smith v. Spisak* is inapplicable to Petitioner's case, (4) Petitioner

admittedly unexhausted ineffective assistance claims are procedurally viable under the exception to the procedural default rule recognized in *Martinez v. Ryan* and *Trevino v. Thaler*, and (5) Petitioner's state habeas counsel was ineffective.

## II. AEDPA Standard of Review

Because Petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of Petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant Petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. Section 2254(d) (1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of

our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010); *Wiggins v. Smith*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has explained:

Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, ___ U.S. ___, ___, 132 S. Ct. 26, 27, 181 L. Ed. 2d 328 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Under the AEDPA, what constitutes "clearly established federal law" is determined through review of the decisions of the United States Supreme Court, not the precedent of the federal Circuit Courts. *See Lopez v. Smith*, ___ U.S. ___, ___, 135 S. Ct. 1, 2, 190 L. Ed. 2d 1 (2014) (holding the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude a particular constitutional principle is "clearly established").

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. 28 U.S.C. Section 2254(d) (2) provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

20

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).  It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2).  *See Wood v. Allen*, 558 U.S. at 300 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review.  *See Miller-El v. Dretke*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's

written opinion supporting its decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. denied*, ___ U.S. ___, 132 S. Ct. 124, 181 L. Ed. 2d 46 (2011); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. *Batson* Claims

A.     The Claims

In his first and second claims for relief in his second amended petition, Petitioner argues (1) the prosecution's use of a peremptory strike against venire member Myrtlene Williams was based upon her religious affiliation and violated equal protection and due process principles and (2) the prosecution's use of a peremptory strike against venire member Paulette Bell was based upon "mixed motives" and violated both Petitioner's and Ms. Bell's equal protection rights under *Batson*.[18]

B.     State Court Disposition

1.     Venire Member Myrtlene Williams

During individual voir dire examination, the prosecution questioned venire member Williams about her participation in Outreach Ministries, which she had mentioned in her juror questionnaire

---

[18] *Second Amended Petition*, at pp. 7-19.

answers.[19]  Ms. Williams explained that while some members of Outreach Ministries went to jails

and prisons to help bring the people who reside there closer to God, help them as they are going

through jail, and help rehabilitate them, she had not participated in these types of activities.[20]  After

asking Ms. Williams about two of her children, the prosecution announced it was exercising a

peremptory strike.[21]  At which point, the trial judge excused Ms. Williams from the courtroom and

the following exchanges occurred:

>    MR. SAWYER: Judge, we're going to issue a <u>Batson</u> challenge.  The State didn't elicit any responses that were appropriate for a challenge.
>
>    THE COURT: Explain it to me.
>
>    MR. BUNK: Me?  Okay.  Our position, Judge, is she participates in what's called the Outreach Ministries, and the group that she participates with goes into the prison for the sole purpose of rehabilitating people within the jail and the prison system.  And that's our main reason.  And then in addition to that, she has a daughter who has, that she had mentioned, been convicted of a larceny type of offense in the State of North Carolina.
>
>    THE COURT: Any questions for him?  Do you want me to put him under oath?
>
>    MR. SAWYER: He's an officer of the Court.
>
>    THE COURT: Okay.
>
>    MR. SAWYER: Mr. Bunk, is there any response by Ms. Williams, to you, that indicate [sic] that she cannot be fair or impartial and listen to the evidence presented in this case?
>
>    MR. BUNK: I didn't ask her that question, sir.
>
>    MR. SAWYER: Exactly.  Is there, in any response from Ms. Williams, that she would not fairly and impartially answer the special issue questions concerning life or death?
>
>    MR. BUNK: No. I choose to strike her because of her membership with Outreach Ministries, and her daughter's – specifically her daughter's criminal history.

---

[19] S.F. Trial, Volume 8, voir dire examination of Myrtlene Williams, at pp. 114-18.

[20] *Id.*, at pp. 115-16.

[21] *Id.*, at pp. 117-18.

MR. SAWYER: Within our scope of the criminal system, if she had a criminal record, that may excuse her from serving as a juror.  This is a family member.  Not her directly; is that correct?

MR. BUNK: That's correct.

MR. SAWYER: Okay.  And of course we recognize the fact she's a Black female.

MR. BUNK: Yeah, I noticed that.  Yes.

MR. SAWYER: I seemed to notice it myself.  That's all I have, sir.  Thank you.

THE COURT: Your challenge is denied.  Bring in Ms. Williams.[22]

In his third point of error on direct appeal, Petitioner argued the prosecution's proffered race-neutral reasons for its use of a peremptory challenge to strike venire member Williams were pretextual.[23]  The Texas Court of Criminal Appeals rejected this argument: "It was not improper for the State to strike Williams based on her connection to Outreach Ministries if it felt her membership could cause her to be more sympathetic to the defendant, particularly in the punishment phase of trial."  *Young v. State*, 283 S.W.3d at 869.

2.      Venire Member Paulette Bell

During her individual voir dire examination by the prosecution, venire member Bell stated (1) she had previously served on a criminal jury which acquitted a defendant charged with molesting a young girl in a park, (2) she was an Evangelical Missionary who was licensed to go into jails, (3) while she had not yet actually gone to a jail, she was working with Outreach at her church and looked forward to going to visiting a jail, (4) her husband and son felt they had been the subjects of racial profiling and had expressed to her their view that it was "hard to be a Black man," (5) she knew

---

[22] *Id.*. at pp. 118-20.

[23] *Appellant's Brief*, at pp. 44-50.

multiple persons who had been to prison, and (6) her son had been to jail for DUI.[24]  At that point,

the prosecution indicated it was exercising a peremptory strike against Ms. Bell, the trial judge

excused Ms. Bell from the courtroom, and the following exchanges occurred:

> MR. DICKSON: Judge, we're going to impose a <u>Batson</u> challenge on this case – on this juror.

> THE COURT: State, explain.

> MR. BUNK: The State struck this juror for a multitude of reasons.  One, she - her husband and son, both Black men, feel like they were – were pulled over, and apparently more than one time on her son's case, and felt like they were victims of racial profiling.  Second reason, she was on a criminal jury and found the defendant - has been on a criminal that reached a not guilty verdict.  She also spoke that she'd like the chance to go to the jail, and minister and preach.  She, uh, while she indicated today that she would be able to be – to consider the death penalty, she strongly opposed to it in her questionnaire, and repeats more than once, under no circumstances could she participate in that.

> Those are the bulk of our reasons, Judge.  Those are out reasons, frankly.

> MR. DICKSON: And. Judge, for the record. she's a Black female.  Judge, their primary reason offered is not a race-neutral reason.  He stated specifically that her husband and her son are Black males, and that consequently they choose to strike her from this case because they supposedly had been the subject of racial profiling.  That is not a race-neutral reason.

> THE COURT: Yeah, but the other ones are.

> MR. DICKSON: Well, they listed that as the primary reason –

> MR. BUNK: I did not.

> THE COURT: They listed it as the first reason.

> MR. DICKSON: Okay.  I'd ask that she be empaneled on that basis, because they have not provided race-neutral reasons for striking this juror.

> THE COURT: Okay, that's denied.  I mean, it's denied.  Bring her in.

> MR. BUNK: And, Judge, we would ask that her questionnaire become part of the record.  I'll bring a clean copy down tomorrow.[25]

---

[24] S.F.Trial, Volume 9, voir dire examination of Paulette Bell, at pp. 247-50.

[25] *Id.*, at pp. 250-52.

In his third point of error on direct appeal, Petitioner argued the prosecution's first justification proffered for its peremptory challenge was not race-neutral and this tainted, i.e., rendered invalid, all of the prosecution's proffered reasons for striking Ms. Bell.[26]  The Texas Court of Criminal Appeals rejected this argument on two different grounds.  First, it held the prosecution's reference to the race of Ms. Bell's husband and son was relevant to the prosecution's explanation of its rationale for striking Ms. Bell:

> the prosecutor's statement that the juror's family members were black was made to explain its decision to strike Bell based on her close familial relationship to persons who believed they experienced racial profiling.  The State's striking of a juror based on her personal or close relative's experiences with or perceptions of law enforcement, particularly one as negative as racial profiling, is not by itself determinative of racial discrimination.  Thus, the appellant did not rebut the State's race-neutral reason for striking Bell based on the prosecutor's mere mentioning of the race of the juror's family members, or its stated concern regarding her family members' previous experiences with racial profiling.

*Young v. State*, 283 S.W.3d at 871 (*footnote omitted*).

The state appellate court also concluded that, even if the prosecution's first proffered reason for striking Ms. Bell was not race-neutral, the trial court had reasonably concluded the prosecution's remaining reasons were:

> Even assuming *arguendo* that the State displayed a discriminatory motive in its first basis for striking Bell and the "mixed motives" doctrine applies, such grounds do not raise equal protection concerns to a level that would require remanding this case to the trial court as was done in *Guzman,* and as is now requested by the appellant.  Unlike in *Guzman,* the State and the trial judge here both noted that the first reason proffered by the State was *not* the primary reason, but rather the *first* of four reasons the State sought to exclude Bell. In addition, the trial judge demonstrated his consideration of the State's other three reasons by responding to the appellant's contention that the State's first reason was not race-neutral by saying

---

[26] *Appellant's Brief*, at pp. 50-54.

"Yeah, but the other ones are."  Lastly, the facts in this case contrast with *Guzman* because the trial judge explicitly denied the appellant's charge of purposeful racial discrimination by the prosecutor.  After reviewing the evidence in a light most favorable to the trial court's ruling, we are able to discern from the present record what the trial court determined concerning the State's allegedly race-based peremptory strike of prospective juror Bell. Therefore, the trial court did not err in overruling the appellant's *Batson* challenges and a remand is not necessary.  Point of error three is overruled.

*Young v. State*, 283 S.W.3d at 871 (*footnotes omitted*).

C.     Clearly Established Federal law

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court extended the equal protection principle barring the purposeful exclusion of Blacks from criminal jury service to the prosecution's use of peremptory challenges during petit jury selection.  *See Batson v. Kentucky*, 476 U.S. at 89 ("the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.").  *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: first, the defendant must make out a prima facie case of discriminatory jury selection by the totality of the relevant facts concerning a prosecutor's conduct during the defendant's own trial; second, once the defendant makes the prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging jurors within the arguably targeted class; and finally, the trial court must determine if the defendant established purposeful discrimination by the prosecution. *Snyder v. Louisiana*, 552 U.S. 472, 476-77  (2008); *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005); *Batson v. Kentucky*, 476 U.S. at 94-98.

With regard to the first step, i.e., establishing a prima facie case, the Supreme Court has described that process as follows:

> a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.   To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.   Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate."

*Batson v. Kentucky*, 476 U.S. at 96 (*citations omitted*).

With regard to the second step, i.e., the prosecution's burden of presenting a neutral reason for the peremptory challenge, the Supreme Court has noted that, while there are any number of bases on which a prosecutor reasonably might believe it is desirable to strike a venire member who is not excused for cause, the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the peremptory challenge.   *Miller-El v. Dretke*, 545 U.S. at 239; *Batson v. Kentucky*, 476 U.S. at 98 n.20.

> It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is.   But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.   A *Batson* challenge does not call for a mere exercise in thinking up any rational basis.   If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

*Miller-El v. Dretke*, 545 U.S. at 252.

With regard to the third and final step in the *Batson* process, the Supreme Court has emphasized the critical role of the trial court in evaluating the prosecutor's credibility.   *Snyder v. Louisiana*, 552 U.S. at 477.

28

> [T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike. At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

*Miller-El v. Cockrell*, 537 U.S. 322, 338-339 (2003).

In considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted and considered. *Snyder v. Louisiana*, 552 U.S. at 478. In several recent opinions the Supreme Court has examined a wide array of factors in resolving *Batson* claims. *See, e.g.*, *Snyder v. Louisiana*, 552 U.S. at 480-85 (holding a prosecutor's proffer of a pretextual explanation regarding the struck venire member's scheduling conflicts, which were significantly less imposing than those of a white venire member whom the prosecutor accepted, permitted an inference of discriminatory intent); *Miller-El v. Dretke*, 545 U.S. at 240-66 (citing the prosecutor's differential questioning of black and white venire members throughout the entire voir dire, the prosecution's "remarkable" use of ten of its fourteen peremptories to strike ten of the eleven black venire members who were not removed for cause or by agreement, the prosecutor's failure to strike white venire members who offered voir dire testimony similar to black venire members whom the prosecutor did strike, and the prosecution's selective requests for a jury shuffle only when black venire members were near the front of the list as evidence warranting a finding of purposeful discrimination).

D.   Analysis of *Batson* Claim Involving Venire Member Williams

       1.   Procedural Default on Unexhausted Religion-Based *Batson* Legal Theory

Petitioner did not object at the time of Ms. Williams' voir dire to the prosecution's use of a peremptory strike against her because of her religious affiliation.  On the contrary, as explained above, Petitioner's trial counsel argued the prosecution's proffered reason for striking Ms. Williams, i.e., her participation in Outreach Ministries, was pre-textual and the real reason the prosecution had stricken her was because of her race.  At no point did Petitioner's counsel inform the trial court that Petitioner objected to Ms. Williams being stricken on First Amendment grounds or suggest there was any religious animus underlying the prosecution's use of a peremptory strike against her.

Petitioner did not argue either on direct appeal or in his state habeas corpus proceeding that the prosecution's use of a peremptory strike against venire member Williams violated constitutional principles on the basis of her religion.  Rather, Petitioner's third point of error on direct appeal raised a classic *Batson* challenge to the prosecution's use of a peremptory strike, i.e., as having been motivated by discriminatory animus based upon the potential juror's race.

At no point has Petitioner "fairly presented" any state court with the wholly new claim asserted as the first ground for relief in Petitioner's second amended petition, i.e., that the striking of Ms. Williams was based upon her exercise of her religious freedoms protected by the First Amendment and, thereby, a violation of Equal Protection and Due Process principles similar to those underlying the rule in *Batson*.

Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); 28 U.S.C. §2254(b)(1).  To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that

court to the federal nature of the claim. *See Baldwin v. Reese*, 541 U.S. at 29-32 (rejecting the argument that a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel*, 526 U.S. at 844-45 (holding comity requires that a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (holding that, for purposes of exhausting state remedies, a claim for *federal* relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief). Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003) ("28 U.S.C. § 2254(b)(1) requires that federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."), *cert. denied*, 543 U.S. 835 (2004); *Henry v. Cockrell*, 327 F.3d 429, 432 (5th Cir. 2003) ("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."), *cert. denied*, 540 U.S. 956 (2003).

The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless*, 459 U.S. 4, 6-7 (1982); *Riley v. Cockrell*, 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim. The federal claim must be

31

the 'substantial equivalent' of the claim brought before the State court."); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement").  Likewise, to have "fairly presented" his new federal claim, the petitioner must have reasonably alerted the state courts to the *federal* nature of his claim. *Baldwin v. Reese*, 541 U.S. at 29-32 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Wilder v. Cockrell*, 274 F.3d at 260 ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights.").  At no point in his appellant's brief did Petitioner "fairly present" the Texas Court of Criminal Appeals with his new "religion-based" *Batson* complaint about the striking of venire member Williams.

The Fifth Circuit has consistently held that federal habeas review on unexhausted claims presented by a convicted Texas criminal defendant is barred under the procedural default doctrine. See, e.g., *Williams v. Thaler*, 602 F.3d 291, 305 (5th Cir.) (procedural default occurs when a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claim in order to meet the exhaustion requirement would now find the claims procedurally barred), *cert. denied*, 562 U.S. 1006 (2010); *Bagwell v. Dretke*, 372 F.3d 748, 755-56 (5th Cir. 2004) (holding a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his state habeas corpus application), *cert. denied*, 543 U.S. 989 (2004); *Smith v.*

*Cockrell*, 311 F.3d 661, 684 (5th Cir. 2002) (holding unexhausted claims were procedurally barred), *cert. dism'd*, 541 U.S. 913 (2004); *Jones v. Johnson*, 171 F.3d 270, 276-77 (5th Cir. 1999)(holding unexhausted ineffective assistance claim procedurally barred from federal habeas review), *cert. denied*, 527 U.S. 1059 (1999).

Section 5(a) of Article 11.071 of the Texas Code of Criminal Procedure prohibits a successive state habeas corpus application except in limited circumstances. *See Williams v. Thaler*, 602 F.3d at 306 (recognizing Article 11.071, §5(a) of the Texas Code of Criminal Procedure bars consideration on the merits of new claims contained in a subsequent state habeas corpus application unless either (1) the new claims could not have been presented in a previous application because the legal or factual basis for the new claims were unavailable at the time the previous application was filed; (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the state's favor one or more of the capital sentencing special issues).[27] Absolutely nothing prevented Petitioner from asserting his new "religion-based" *Batson* claim in the course of his direct appeal or state habeas corpus proceeding. Likewise, Petitioner alleges no facts in this Court which satisfies either of the final two exceptions to the Texas writ-abuse barrier erected by Section 5(a) of Article 11.071. On the contrary, the evidence of Petitioner's guilt was overwhelming, as was the evidence supporting the jury's answers to the Petitioner's capital sentencing special

---

[27] Under Texas statute, a legal basis of a claim is unavailable on or before a date if the legal basis was not recognized by or could not have been reasonably formulated from a final decision of the united States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of the State of Texas on or before that date. Article 11.071, §5(d), TEX. CODE CRIM, PROC. ANN. (Vernon 2015). A factual basis of a claim is unavailable on or before a date if the factual basis was not ascertainable through the exercise of reasonable diligence on or before that date. Article 11.071, §5(e), TEX. CODE CRIM, PROC. ANN. (Vernon 2015).

issues.  Nothing in Petitioner's appellant's brief or state habeas corpus application "fairly presented" the Texas Court of Criminal Appeals with the same *federal constitutional* argument contained in Petitioner's amended claims for relief before this Court.  If Petitioner were to attempt at this juncture to return to state court and assert these new federal constitutional arguments underlying his sixth through twelfth claims herein in a successive state habeas application, the applicable provisions of the Texas writ-abuse statute would preclude him from doing so.  Thus, Petitioner failed to exhaust available state remedies on his claims herein and, thereby, procedurally defaulted on same.  *See Canales v. Stephens*, 765 F.3d 551, 577 (5th Cir. 2014) (holding petitioner failed to "fairly present" federal constitutional claim to state habeas court (and thereby procedurally defaulted) where petitioner quoted a United States Supreme Court opinion but did not cite the Supreme Court opinion as presenting the legal standard for review and, instead, cited state cases and argued  his shackling during trial was an abuse of discretion under state law); *Hughes v. Dretke*, 412 F.3d 582, 594-95 (5th Cir. 2005) (holding petitioner procedurally defaulted on a jury misconduct claim by presenting the state courts with purely state-law arguments supporting same and waiting until he reached federal court to first urge federal constitutional arguments), *cert. denied*, 546 U.S. 1177 (2006); *Beazley v. Johnson*, 242 F.3d 248, 264-68 (5th Cir. 2001) (holding petitioner procedurally defaulted on a claim by failing to present same to the Texas Court of Criminal Appeals either on direct appeal or in a state habeas corpus application where claim was readily available at the time petitioner filed his state habeas application), *cert. denied*, 534 U.S. 945 (2001).

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental

miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753; *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine). While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, Petitioner does not argue or allege any specific facts suggesting his state appellate counsel's failure to present the same federal constitutional complaints about the trial court's rulings on the challenges for cause somehow rendered said counsel's performance ineffective under the standard of *Strickland v. Washington*.

Petitioner cannot satisfy the "cause and actual prejudice" standard for circumventing his procedural default of his claims for relief because, at the time of Petitioner's trial, direct appeal, and state habeas corpus proceeding, the United States Supreme Court had not extended the rule in *Batson* to include peremptory strikes based upon a potential juror's religious affiliation. *See Fisher v. Texas*, 169 F.3d 295, 305 (5th Cir. 1999) (holding no precedent existed at that time clearly dictating an extension of the *Batson* principle to religion). Petitioner's state trial counsel, state appellate counsel, and state habeas counsel cannot reasonably be faulted for failing to present a "religion-based" *Batson* challenge to the striking of venire member Williams. Even now, no legal basis for such a challenge exists under clearly established federal law.

In order to satisfy the "miscarriage of justice" test, a petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333,

335-36 (1992).  In the context of the punishment phase of a capital trial, the Supreme Court has held

that a showing of "actual innocence" is made when a petitioner shows by clear and convincing

evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible

for the death penalty under applicable state law.  *Sawyer v. Whitley*, 505 U.S. at 346-48.  The

Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those

elements which render a defendant *eligible* for the death penalty and not on additional mitigating

evidence that was prevented from being introduced as a result of a claimed constitutional error.

*Sawyer v. Whitley*, 505 U.S. at 347.  Petitioner has alleged no specific facts satisfying this "factual

innocence" standard.  Because Petitioner has failed to satisfy the "actual innocence" test, he is not

entitled to relief from his procedural default under the fundamental miscarriage of justice exception

to the procedural default doctrine.

      2.    *Teague v. Lane* Forecloses Extension of *Batson* to Religion

Respondent argues this Court is precluded from recognizing the new legal theory underlying

Petitioner's claims herein in the context of this federal habeas corpus proceeding.  *See Teague v.*

*Lane*, 489 U.S. 288, 310 (1989) (holding that, unless they fall within an exception to the general rule,

new constitutional rules of criminal procedure will not be applicable to those cases which have

become final before the new rules are announced).  Under the holding in *Teague*, federal courts are

generally barred from applying new constitutional rules of criminal procedure retroactively on

collateral review.  *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994).  A "new rule" for *Teague*

purposes is one which was not dictated by precedent existing at the time the defendant's conviction

became final.  *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (holding a "new rule" either

"breaks new ground," "imposes a new obligation on the States or the Federal Government," or was

not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when a petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. *Caspari v. Bohlen*, 510 U.S. at 390.

The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen*, 510 U.S. at 390. Petitioner's conviction became final under this standard on December 14, 2009 when the United States Supreme Court denied Petitioner's petition for writ of certiorari. *Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks*, 536 U.S.

266, 268-72 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243,

255 (5th Cir. 2003)(recognizing the continued vitality of the *Teague* non-retroactivity doctrine under

the AEDPA), *cert. denied*, 539 U.S. 979 (2003).

As of the date Petitioner's conviction and sentence became final for *Teague* purposes no

federal court, much less the United States Supreme Court, had held the rule announced in *Batson*

applied to peremptory strikes exercised, allegedly, based upon a potential juror's religion affiliation.

Thus, unless Petitioner's proposed new rule falls within one of the exceptions to the *Teague* non-

retroactivity doctrine recognized by the Supreme Court, Petitioner's claims herein may not furnish

a basis for federal habeas corpus relief.

The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new

rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain

category of punishment for a class of defendants because of their status or offense and (2)

"watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the

criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are

implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157, 117 S.Ct. at 1973;

*Fisher v. Texas*, 169 F.3d at 306. The new rule proposed by petitioner in his first claim herein does

not fall within either of the two noted exceptions to the *Teague* doctrine. *See Fisher v. Texas*, 169

F.3d at 306:

> Neither exception applies to this case. Application of *Batson* to religion would not
> protect any primary conduct, nor would it implicate the fundamental fairness and
> accuracy of the criminal proceeding. The *Teague* Court found that neither exception
> applied to a similar constitutional issue of criminal procedure, i.e., whether the Sixth
> Amendment fair cross section requirement applied to the petit jury. *See* 489 U.S. at
> 311-16, 109 S.Ct. 1060. Furthermore, the Supreme Court declined to apply *Batson*
> retroactively to proceedings on collateral review in *Allen v. Hardy,* 478 U.S. 255, 106
> S.Ct. 2878, 92 L.Ed.2d 199 (1986). *See id.* at 259-61, 106 S.Ct. 2878 (explaining

that the rule announced in *Batson* did not have "such a fundamental impact on the integrity of factfinding as to compel retroactive application"). In addition, courts have applied the *Teague* bar to subsequent extensions of *Batson,* rejecting petitioners' claims that the exceptions apply. *See, e.g., Nguyen v. Reynolds,* 131 F.3d 1340, 1351-52 (10th Cir.1997) (determining that application of *Powers v. Ohio,* 499 U.S. 400, 406, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), which held that *Batson* claims did not require racial identity between the defendant and challenged venire member, was a new rule under *Teague* and that neither exception applied), *cert. denied,* 525 U.S. 852, 119 S.Ct. 128, 142 L.Ed.2d 103 (1998); *Jones v. Gomez,* 66 F.3d 199, 204 (9th Cir.1995) (same).

3.    Conclusions

Petitioner's first claim for relief in his second amended petition is unexhausted, procedurally defaulted, and barred by the *Teague* doctrine. Petitioner's first claim in his second amended petition does not furnish a basis for federal habeas corpus relief.

E.    Analysis of *Batson* Claim Involving Venire Member Bell

1.    AEDPA Review

As noted by the Texas Court of Criminal Appeals, in the course of rejecting Petitioner's *Batson* challenge to the prosecution's use of a peremptory strike against venire member Bell, the state trial court ruled that even if the prosecution's first proffered race-neutral reason for striking venire member Bell were not truly race-neutral, the remaining reasons furnished by the prosecution were, i.e., the fact Bell had previously served on a jury which had acquitted a criminal defendant, Bell was a licensed missionary who looked forward to ministering in jail, and, in her juror questionnaire answers, Bell had strongly indicated she could not vote to impose a death sentence. The state trial court implicitly found these clearly race-neutral reasons to be credible and sufficient

to support the prosecution's exercise of a peremptory strike against Bell.[28]  Petitioner does not allege

any facts, much less offer any clear and convincing evidence, showing the state trial judge's implicit

credibility finding on this subject was objectively unreasonable.

The state trial court's ruling in favor of the prosecution constitutes an implicit factual finding

regarding the credibility of the prosecutor's proffered race-neutral reasons for striking Bell, to which

this Court must defer absent clear and convincing evidence to the contrary in the record.  *See Rice*

*v. Collins*, 546 U.S. at 338-39 (recognizing state court factual findings regarding the credibility of

a prosecutor's race-neutral explanation for a peremptory strike are entitled to a presumption of

correctness absent clear and convincing evidence to the contrary); *Moody v. Quarterman*, 476 F.3d

260, 268-72 (5th Cir.) (holding a state appellate court's factual findings on a *Batson* claim were

entitled to federal court deference even where the state trial court failed to employ the three-step

approach required for analysis of *Batson* claims), *cert. denied*, 552 U.S. 843 (2007).

Other than Petitioner's assertion that the prosecution's first proffered reason was not truly

race-neutral, Petitioner offered the state trial court and Texas Court of Criminal Appeals no evidence

of racial animus underlying the peremptory strike of Bell.  Petitioner does not allege any facts, much

less furnish any evidence, showing Bexar County prosecutors have ever engaged in the type of

longstanding, systematic, exclusion of an identifiable protected group from criminal juries which was

practiced in Dallas County and twice rejected by the United States Supreme Court in *Miller-El v.*

*Dretke*. 545 U.S. 231 (2005), and *Miller-El v. Cockrell*, 537 U.S. 322  (2003).  On the contrary, the

prosecution's identification of Bell as a person who had previously served on a jury which acquitted

---

[28] S.F. Trial, Volume 9, voir dire examination of Paulette Bell, at p. 251 (state trial judge quoted as responding to petitioner's trial counsel's arguments that the prosecution's first proffered reason was not race-neutral by stating "Yeah, but the other ones are.").

a criminal defendant of a serious felony, was licensed as a missionary who looked forward to ministering in jail, and who had given answers on her juror questionnaire indicating her unwillingness to ever vote to impose the death penalty furnished the state trial court with ample race-neutral reasons for the prosecution's use of a peremptory strike. There was nothing objectively unreasonable with either the state trial court's implicit factual findings or the Texas Court of Criminal Appeals' legal conclusions rejecting on the merits petitioner's *Batson* claim regarding Bell.

The Texas Court of Criminal Appeals' rejection on the merits in the course of Petitioner's direct appeal of Petitioner's *Batson* challenge to the prosecution's striking of venire member Bell was neither contrary to, nor involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial court and direct appeal proceedings.

2.    *Teague* Foreclosure

Petitioner argues that because the first reason proffered by the prosecution for striking Bell was not in Petitioner's view truly race-neutral, the prosecution should have been barred from proffering any truly race-neutral reasons and the state appellate court erred in applying a "mixed motives" analysis to approve the state trial court's decision to accept the prosecution's remaining, clearly race-neutral, reasons as justification for the prosecution's peremptory strike of Bell.[29] Respondent correctly points out neither the Supreme Court nor any other federal appellate court has

---

[29] *See Second Amended Petition*, at p. 18 ("*Batson* stands for the principle that race may play *no role* in the jury selection process.  Allowing race-based strikes when the striking party proffers additional race-neutral reasons cannot be reconciled with *Batson's* categorical principal.").  Petitioner cites no authority to support this argument.  This Court's independent research has discovered no such authority, either.

41

ever adopted the "new rule" advocated by Petitioner in his second claim herein. The new rule advocated by Petitioner in his second claim in his second amended petition is barred by the non-retroactivity principle announced in *Teague v. Lane.*

3.    Conclusions

The Texas Court of Criminal Appeals reasonably rejected Petitioner's *Batson* challenge to the prosecution's peremptory strike of venire member Bell, in full conformity with the Supreme Court's *Batson* case law, based upon the state trial court's implicit factual determination that the prosecution's three proffered race-neutral reasons for striking Bell were credible. Furthermore, adoption of the new rule advocated by Petitioner in his second claim herein is barred by *Teague.* Petitioner's second claim does not warrant federal habeas corpus relief.

**IV. *Simmons* and the Punishment Phase Jury Instructions**

A.    The Claim

In his third claim in his second amended petition, Petitioner argues his capital sentencing jury was misled by the punishment phase jury instructions regarding the effect of a single holdout juror on the outcome of that phase of Petitioner's capital murder trial.[30]

B.    State Court Disposition

Petitioner did not present this same claim as a point of error on direct appeal. Petitioner did, however, include a somewhat similar claim as his twentieth claim for relief in his state habeas corpus application.[31] The Texas Court of Criminal Appeals concluded Petitioner's twentieth claim for relief

---

[30] *Second Amended Petition*, at pp. 19-23.

[31] State Habeas Transcript, at pp. 100-01. Contrary to the suggestion contained in Respondent's Answer, this Court's independent review of Petitioner's state habeas corpus application reveals the twentieth claim asserted therein reveals Petitioner's state habeas corpus application did not fairly present the Texas Court of Criminal Appeals with the same federal constitutional claim, premised upon *Simmons v. South Carolina*, which Petitioner presented as his third

was procedurally defaulted because Petitioner failed to present this same claim as a point of error on direct appeal. *Ex parte Christopher Anthony Young*, WR-70,513-01, 2013 WL 2446428, *1 (Tex. Crim. App. June 5, 2013).[32]

## C.    Procedural Default

Insofar as Petitioner's third claim in his second amended petition embraces the same legal arguments contained in Petitioner's twentieth claim for relief in his state habeas corpus application, that claim is procedurally defaulted. *See Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007) (recognizing the Texas Court of Criminal Appeals has held that record based claims not raised on direct appeal will not be considered in state habeas corpus proceedings and the Fifth Circuit has held this state procedural rule firmly established since at least 1998), *cert. denied*, 552 U.S. 1232 (2008); *Busby v. Dretke*, 359 F.3d 708, 718-19 (5th Cir.) (recognizing the Texas Court of Criminal Appeals' decision in *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996), *clarified on reh'g* (Feb. 4, 1998), firmly established the rule in Texas that record-based claims not raised on direct appeal will

---

ground for relief in his second amended petition herein.  Petitioner's twentieth claim in his state habeas corpus application was premised upon the Supreme Court's holdings in *McKoy v. North Carolina* and *Mills v. Maryland*, not on the Supreme Court's holding in *Simmons*, which forms the legal basis for Petitioner's third claim in his second amended petition herein.  While both Petitioner's twentieth claim in his state habeas corpus application and his third claim in his second amended federal habeas corpus petition challenge the so-called Texas twelve-ten rule, i.e., the constitutionality of Article 37.071, §2(g), TEX. CODE CRIM. PROC. ANN., the legal arguments supporting Petitioner's twentieth claim in his state habeas corpus application and the legal arguments supporting his third claim in his second amended federal habeas corpus petition are different.  Petitioner did not fairly present the state habeas court with the same legal arguments he has presented to this Court in his third claim in his second amended petition herein.  Thus, Petitioner's third claim herein is unexhausted and procedurally defaulted but for reasons slightly different than those argued by Respondent.

[32] The Texas Court of Criminal Appeals' Order denying Petitioner state habeas corpus relief expressly held Petitioner's twentieth claim therein was procedurally defaulted and cited as authority for that holding its opinions in *Ex parte Goodman*, 816 S.W.2d 383 (Tex. Crim. App. 1991); and *Ex parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989). In both *Goodman* and *Banks*, the Texas Court of Criminal Appeals held an application for state habeas corpus relief in Texas may not be used to litigate matters which should have been raised on direct appeal.  *Ex parte Goodman*, 816 S.W.2d at 385; *Ex parte Banks*, 769 S.W.2d at 540.

not be considered in a subsequent state habeas corpus proceeding), *cert. denied*, 541 U.S. 1087 (2004).

Insofar as Petitioner seeks to rely upon the Supreme Court's holding in *Simmons v. South Carolina*, and the other legal arguments contained in his third claim for relief in his second amended petition, his third claim for relief herein is unexhausted and procedurally defaulted. *See Hughes v. Dretke*, 412 F.3d at 594-95 (holding petitioner procedurally defaulted on a jury misconduct claim by presenting the state courts with purely state-law arguments supporting same and waiting until he reached federal court to first urge federal constitutional arguments); *Wilder v. Cockrell*, 274 F.3d at 259 ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement").

In such circumstances, this Court can address the merits of Petitioner's third claim for relief only if Petitioner can satisfy the cause and actual prejudice or fundamental miscarriage of justice exceptions to the procedural default doctrine. "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750; *see also Brewer v. Quarterman*, 466 F.3d 344, 347 (5th Cir. 2006) (cause to overcome a procedural default exists only where "the prisoner can demonstrate actual prejudice as a result of the alleged violation of federal law," or where it would work "a fundamental miscarriage of justice" (*quoting Coleman*)), *cert. denied*, 552 U.S. 834 (2007). Petitioner cannot

satisfy either of the exceptions to the procedural default doctrine because, as explained below, Petitioner's *Simmons* claim is without merit.

D.    No Merit

Because no state court has yet ruled on the Petitioner's unexhausted *Simmons* claim, this Court's review of same is necessarily de novo.  *See Porter v. McCollum*, 558 U.S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534 (holding the same).

Insofar as Respondent argues Petitioner's affidavits from several members of Petitioner's petit jury are inadmissible under Fed. R. Evid. 606(b) to support Petitioner's claims herein, Respondent is correct.  *See Tanner v. United States*, 483 U.S. 107, 120-25 (1987) (recognizing that Rule 606(b) precludes juror testimony regarding "any matter or statement occurring during the course of the jury's deliberations *or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith*..."); *Summers v. Dretke*, 431 F.3d 861, 873 (5th Cir. 2005) ("Under Rule 606(b) of the Federal Rules of Evidence, jurors' affidavits are inadmissible 'regarding the following four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mind set or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.'"),

*cert. denied*, 549 U.S. 840 (2006); *United States v. Jones*, 132 F.3d 232, 245 (5th Cir. 1998), *aff'd*,

527 U.S. 373 (1999).

Section 2(d) of Article 37.071 of the Texas Code of Criminal Procedure provides as follows:

The court shall charge the jury that:
(1) in deliberating on the issues submitted under Subsection (b) of this article, it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty;
(2) it may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously and it may not answer any issue "no" unless 10 or more jurors agree; and
(3) members of the jury need not agree on what particular evidence supports a negative answer to any issue submitted under Subsection (b) of this article.

At the punishment phase of trial, Petitioner's capital sentencing jury was instructed, in

pertinent part, as follows:

You are instructed that sentence of life or death is mandatory upon conviction of a capital felony.

It now becomes your duty to consider all the evidence in this case and determine the answers to certain questions which will be set forth for your consideration. The questions will be termed "issues" in this charge, and must be answered "Yes" or "No"; the punishment to be assessed the defendant will be assessed based on your answers to these issues.

If the jury returns an affirmative finding on the first special issue submitted, and a negative finding on the second special issue, this Court shall sentence the defendant to death. If the jury returns a negative finding on the first special issue or an affirmative finding as to the second special issue, the Court shall sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

In deliberating upon the special issues, you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You are instructed that the State must prove the first issue beyond a reasonable doubt.

The jury may not answer the first issue "Yes" unless there is unanimous agreement of the individual jurors upon that answer.

The jury may not answer the first issue "No" unless ten or more jurors agree upon that answer. however, the ten jurors need not agree on what particular evidence supports a "No" answer to the issue.

The first issue is:

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Christopher Young, would commit criminal acts of violence that would constitute a continuing threat to society?

Answer: We the jury unanimously find and determine beyond a reasonable doubt the answer to this

special issue is "Yes".

OR

Answer: We the jury, because at least ten (10) jurors have a reasonable doubt as to the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, answer this special issue "No".

If you have answered the first special issue "Yes", then you will answer special issue number two.

The second issue is:

State whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

<u>Answer</u>: We. the jury. unanimously find and determine that the answer to this Special Issue is "No".

OR

<u>Answer</u>: We. the jury. because at least ten (10) jurors find that there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed, answer this Special Issue "Yes".[33]

Petitioner argues his jurors were misled by the foregoing instructions because the trial court failed to inform the jury that a failure by the jury to unanimously agree on an answer to any special issue favorable to the prosecution and a simultaneous failure by at least ten jurors to agree on an answer to any special issue favorable to the defense would also result in a life sentence for the

---

[33] Trial Transcript, at pp. 309-11; S.F. Trial, Volume 18, at pp. 68-70.

Petitioner.  Petitioner argues such an instruction is mandated by the Supreme Court's holding in *Simmons v. South Carolina*, 512 U.S. 154 (1994).

The Supreme Court has implicitly rejected Petitioner's arguments underlying his third claim herein.  *See Jones v. United States* 527 U.S. 373, 382 (1999) (holding the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death).  On numerous occasions, the Fifth Circuit has expressly rejected the legal premise underlying Petitioner's third claim herein, i.e., the argument a Texas capital murder defendant is constitutionally entitled to have his punishment-phase jury instructed regarding the consequences of a hung jury or a single holdout juror.  *See, e.g., Hughes v. Dretke*, 412 F.3d at 593-94 (holding the same arguments underlying petitioner's third claim herein were so legally insubstantial as to be unworthy of a certificate of appealability); *Alexander v. Johnson*, 211 F.3d 895, 897-98 (5th Cir. 2000) (holding the *Teague v. Lane* non-retroactivity doctrine precluded applying such a rule in a federal habeas context); *Davis v. Scott*, 51 F.3d 457, 466-67 (5th Cir. 1995), *cert. denied*, 516 U.S. 992 (1995).

Petitioner's reliance upon *Simmons v. South Carolina* is likewise unpersuasive.  In *Simmons*, the Supreme Court addressed capital sentencing in South Carolina and other jurisdictions which authorized capital sentencing juries to impose sentences of either death or life without the possibility of parole.  In contrast to South Carolina, at the time of Petitioner's trial, Texas did not provide for

a sentence of life imprisonment without the chance of parole.   Rather, Petitioner's jury was

instructed at the punishment phase of trial, as follows:

> Under the law applicable in this case, if the defendant is sentenced to
> imprisonment in the Institutional Division of the Texas Department of Criminal
> Justice for life, the defendant will become eligible for release on parole, but not until
> the actual time served by the defendant equals 40 years, without consideration of any
> good conduct time.  It cannot accurately be predicted how the parole laws might be
> applied to the defendant if the defendant is sentenced to a term of imprisonment for
> life because the application of those laws will depend on decisions made by prison
> and parole authorities, but eligibility for parole does not guarantee that parole will be
> granted.[34]

The Supreme Court's opinion in *Ramdass v. Angelone*, 530 U.S. 156 (2000), continued the

vitality of the distinction recognized in *Simmons*, as the Supreme Court plurality specifically limited

the holding in *Simmons* to "only those instances where, as a legal matter, there is no possibility of

parole if the jury decides the appropriate sentence is life in prison." *Id.*, 530 U.S. at 169.   In her

separate, concurring, opinion in *Ramdass*, Justice O'Connor once again emphasized her view of the

continued vitality of the rule in *Simmons*, as enunciated by the plurality in *Ramdass*, and also pointed

out *Ramdass* came before the Supreme Court in the context of a federal habeas corpus proceeding,

in which the Supreme Court's review, like this Court's review in the present cause, is circumscribed

by the terms of the AEDPA. *Id.*, 530 U.S. at 179 (concurring opinion).

The Supreme Court's opinion in *Shafer v. South Carolina*, 532 U.S. 36 (2001), at least

implicitly acknowledged the continued vitality of the distinction first noted in *Simmons* by holding

South Carolina's new capital sentencing scheme was guilty of the same constitutional defect

identified in *Simmons* because, at least under some circumstances, the sentencing jury would be

---

[34] Trial Transcript, at p. 319; S.F. Trial, Volume 18, at pp. 78-79.

faced with a choice between a sentence of death and a sentence of life without the possibility of parole.  *See Shafer v. South Carolina*, 532 U.S. at 51 ("We therefore hold that whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole.").  In *Kelly v. South Carolina*, 534 U.S. 246 (2002), the Supreme Court reiterated its holding in *Shafer*, emphasizing once again South Carolina capital sentencing juries which unanimously found the presence of an aggravating circumstances were left to select between one of only two possible sentences: death or life imprisonment without the possibility of parole.  *Kelly v. South Carolina*, 534 U.S. at 252 & n.2.

At the time of Petitioner's offense and trial, Texas law did not provide for a sentence of life imprisonment without the possibility of parole.  The Supreme Court's Fourteenth Amendment jurisprudence, including *Simmons*, *Ramdass*, *Shafer*, and *Kelly*, makes an express distinction between the rule applied in *Simmons* and *Shafer* and the due process requirements in jurisdictions such as Texas at the time of Petitioner's crime and capital murder trial, where sentences of either death or life without parole were *not* the only choices facing a capital sentencing jury.  The legal premise underlying Petitioner's third claim herein ignores this critical distinction.  There is simply no "clearly established" federal law, as enunciated by the United States Supreme Court, holding the Fourteenth Amendment's Due Process Clause requires capital sentencing juries at the time of Petitioner's capital murder trial to be informed of the impact of a single holdout juror on any of the Texas capital sentencing special issues.

On the contrary, the Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial as "whether there

is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).   The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. *See Weeks v. Angelone*, 528 U.S. 225, 226 (2000) (emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States*, 527 U.S. 373, 390 & n.9 (1999) (holding the same); *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (holding the same); *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) (holding the same); *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (holding *Boyde* requires a showing of a reasonable likelihood the jury interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence).

This "reasonable likelihood" standard does not require a petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, a petitioner must demonstrate more than "only a possibility" of an impermissible interpretation. *Johnson v. Texas*, 509 U.S. at 367; *Boyde v. California*, 494 U.S. at 380.   This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge. *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973).   "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U.S. at 368; *Boyde v. California*, 494 U.S. at 381.

Nothing in Petitioner's punishment-phase jury charge can reasonable be construed as foreclosing the consideration by Petitioner's jury of any of the potentially mitigating evidence actually presented during Petitioner's capital murder trial. None of Petitioner's jurors could rationally have been led to believe by Petitioner's punishment-phase jury charge that either (1) they lacked the authority to answer either of the Texas capital special issues in a manner consistent with their conscience and the evidence regardless of the votes of other jurors or (2) their determination to vote in a manner inconsistent with other jurors would have no legal impact. Thus, there is no reasonable likelihood any of Petitioner's jurors construed their punishment phase jury instructions in a manner which prevented them from considering or giving effect to any constitutionally relevant mitigating evidence.

Likewise, nothing in Petitioner's punishment-phase jury charge misled Petitioner's capital sentencing jury regarding its role as the ultimate arbiter of Petitioner's fate. Petitioner's argument is foreclosed by both Supreme Court and Fifth Circuit precedent recognizing there is no constitutional right to jury instructions instructing individual jurors how they can achieve a "hung jury." *See Jones v. United States*, 527 U.S. at 382 (the Eighth Amendment does *not* require a capital sentencing be instructed as the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death); *Druery v. Thaler*, 647 F.3d 535, 544 (5th Cir. 2011) (holding an argument that a Texas capital defendant had a constitutional right to an instruction informing the jury of the impact of a hung jury barred under the non-retroactivity doctrine of *Teague v. Lane*), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1550, 182

L.Ed.2d 180 (2012); *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. ) (recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict), *cert. denied*, 551 U.S. 1193 (2007).

Petitioner's reliance upon the Supreme Court's holdings in *McKoy* and *Mills* is also unpersuasive.  Petitioner's argument that the Texas twelve-ten rule violates the due process principles set forth in these opinions has repeatedly been rejected by the Fifth Circuit. *See, e.g., Blue v. Thaler*, 665 F.3d 647, 669-70 (5th Cir. 2011) (rejecting an Eight Amendment challenge to the Texas twelve-ten rule), *cert.* denied, ___ U.S. ___, 133 S.Ct. 105, 184 L.Ed.2d 49 (2012); *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000) (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas twelve-ten rule in the course of affirming this Court's rejection of claims virtually identical to those raised by Petitioner herein); *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir. 2000) (holding *Mills* inapplicable to a Texas capital sentencing proceeding), *cert. denied*, 531 U.S. 849 (2000); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996) (holding the same), *cert. denied*, 519 U.S. 854 (1996).  For the reasons discussed by the Fifth Circuit in each of the foregoing opinions, i.e., because the Texas capital sentencing scheme is vastly different from those employed in Maryland and North Carolina, Petitioner's reliance on the Supreme Court's opinions in *McKoy* and *Mills* is misplaced.  Viewed under a *de novo* standard, Petitioner's third claims herein lack merit and do not warrant federal habeas corpus relief.

### V. Failure to Instruct Jury Pursuant to Article 37.071, §2(f)(3)

A.     The Claim

In his fourth claim in his second amended petition, Petitioner argues his Eighth Amendment rights recognized in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), were violated when the state trial court failed to instruct the jury at the punishment phase of his trial in accordance with Article 37.071, §2(f)(3) of the Texas Code of Criminal Procedure, i.e., the jury was not informed that the jurors need not agree on what evidence supported an affirmative answer to the second special issue (the mitigation special issue).[35]

B.   State Court Disposition

Petitioner presented the same claim as his fifteenth point of error on direct appeal.[36]   The Texas Court of Criminal Appeals rejected this claim on the merits:

> Finally, in the appellant's fifteenth point of error, he complains that the trial court, when instructing the jury regarding the mitigation special issue, failed to give the instruction contained in Article 37.071, § 2(f)(3).  He argues that this violated his rights under both the Eighth and Fourteenth Amendments to the United States Constitution.
> At punishment, the trial court instructed the jury:
> The second issue is:
> State whether, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
> Jurors were not instructed that they "need not agree on what particular evidence supports an affirmative finding on the issue."
> The appellant argues that the charge robbed him of the safeguard of having jurors made unambiguously aware that they did not need to agree on the particular evidence that supported a "yes" answer to the mitigation issue.  The appellant further argues that the instruction skewed the jury's understanding in the prosecution's favor, and therefore, he was denied the constitutional guarantee of jury unanimity.
> The appellant did not object to the charge, but now contends that the lack of the instruction egregiously harmed him under the standard set out in Almanza v.

---

[35] *Second Amended Petition*, at pp, 23-26.

[36] *Appellant's Brief*, at pp. 106-18.

State.  The appellant relies on *Mills v. Maryland* to support his argument that the lack of the Article 37.071, § 2(f)(3), instruction requires reversal.  The charge in *Mills* listed the statutorily available mitigating circumstances in that case and directed jurors to unanimously affirm whether they agreed or disagreed that each circumstance did or did not exist.  The United States Supreme Court found that such a charge improperly required that all jurors unanimously agree on the mitigating circumstances before finding that those circumstances warranted a life sentence.  However, even when presented with the circumstances in *Mills,* the Supreme Court did not go so far as to say it is a constitutional requirement that every jury deliberating punishment in a capital case should be explicitly instructed that the jurors need not agree on the particular mitigating circumstances.

In this case, while jurors were not given the statutorily required instruction that they need not agree on the particular mitigating evidence, they unanimously found that no sufficient mitigating circumstance or circumstances warranted that a life sentence be imposed.  The foreman signed the answer that stated: "We, the jury, unanimously find and determine that the answer to this Special Issue is 'No.' " Because no juror believed there was a circumstance or circumstances that warranted a life sentence, there was no possibility that the jurors would be confused about a need to agree on a particular circumstance or circumstances.

Although the trial court erred in failing to give the statutory instruction, in this case, the appellant was not deprived of the constitutional guarantee of a unanimous verdict and did not suffer egregious harm.  Nor was the appellant denied a fair trial.  Point of error fifteen is overruled.

*Young v. State*, 283 S.W.3d at 878-79 (*footnotes omitted*).

C.    <u>AEDPA Analysis</u>

Because the Texas Court of Criminal Appeals rejected on the merits Petitioner's arguments regarding the absence of a punishment jury instruction informing the jury it need not unanimously agree on which evidence supported an affirmative answer to the mitigation special issue, Respondent correctly argues this Court is precluded from considering any of the new evidence Petitioner has presented in support of this same claim in this Court.  *See Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1401, 179 L. Ed. 2d 557 (2011) (holding a federal habeas petitioner is not entitled to present new evidence supporting a claim in federal court when the state court has ruled on the merits of the underlying claim); *Loden v. McCarty*, 778 F.3d 484, 493 (5th Cir. 2015) ("When, as

here, a habeas petitioner's claim has been adjudicated on the merits in state court, 'review under §

2254(d)(1) is limited to the record that was before the state court.'" (*quoting Cullen v. Pinholster*)),

*cert. filed June 29, 2015, no. 15-10*; *Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014) ("The

Supreme Court has clarified that when a claim is adjudicated on the merits, for the purposes of

review under § 2254(d)(1), the record is limited to the one before the state court, even if the state

court issued a summary affirmance."), *cert. filed April 27, 2015, no. 14-1288).*   Respondent also

correctly points out the juror affidavits submitted by Petitioner in support of this claim may not be

considered by this Court for the purposes Petitioner has submitted them.  *Tanner v. United States*,

483 U.S. at 120-25; *Summers v. Dretke*, 431 F.3d at 873.

　　　In *Mills*, the Supreme Court rejected a capital sentencing system in a weighing jurisdiction

in which the jury was informed, both through the trial court's jury instructions as well as the verdict

form, that it could not consider a mitigating circumstance or even particular mitigating evidence

unless the jury unanimously agreed upon the existence of that particular mitigating circumstance:

> there is a substantial probability that reasonable jurors, upon receiving the judge's
> instructions in this case, and in attempting to complete the verdict form as instructed,
> well may have thought they were precluded from considering any mitigating evidence
> unless all 12 jurors agreed on the existence of a particular such circumstance.  Under
> our cases, the sentencer must be permitted to consider all mitigating evidence.  The
> possibility that a single juror could block such consideration, and consequently
> require the jury to impose the death penalty, is one we dare not risk.

*Mills v. Maryland*, 486 U.S. at 384.

　　　Construed under the reasonable juror standard applied by the Supreme Court in *Mills*,[37]

nothing in Petitioner's punishment phase jury instructions or punishment phase verdict form

---

[37] *See Mills v. Maryland*, 486 U.S. at 375-76, 108 S. Ct. at 1866 ("The critical question, then, is whether
petitioner's interpretation of the sentencing process is one a reasonable jury could have drawn from the instructions given
by the trial judge and from the verdict form employed in this case.").

56

informed a reasonable juror serving at the punishment phase of Petitioner's capital murder trial that

the jury or any individual juror was precluded from considering any particular mitigating evidence

which might support an affirmative answer to the mitigation special issue unless the entire jury

unanimously agreed upon the existence of that mitigating evidence.  On the contrary, Petitioner's

jury was repeatedly admonished by the trial judge's punishment phase instructions, as well as the

verdict form, that it was to consider all of the evidence presented during both phases of Petitioner's

trial.[38]  This Court's independent review of the punishment phase jury arguments, the general voir

dire examination, and individual voir dire examination of the jurors who served on Petitioner's jury

also reveals no evidence suggesting any of the jurors were ever informed they could not consider any

evidence as "mitigating" unless the entire jury unanimously agreed upon the existence of that

evidence.[39]

More significantly, the Supreme Court addressed a situation far more analogous to

Petitioner's trial than the situation in *Mills*.  In *Smith v. Spisak*, 558 U.S. 139 (2010), the Supreme

Court held no constitutional error existed with jury instructions and a verdict form used in another

weighing jurisdiction which "did not say that the jury must determine the existence of each

---

[38] *See* note 34, *supra*, and accompanying text.

[39] The prosecution's punishment phase jury arguments appear at S.F. Trial, Volume 18, at pp. 79-86, 108-16. Defense counsels' closing jury argument at the punishment phase of Petitioner's trial appears at S.F. Trial, Volume 18, at pp. 86-108.  The general voir dire of Petitioner's entire jury venire appears at S.F. Trial, Volume 2, at pp. 3-59.

The individual voir dire examination of Petitioner's twelve petit jurors appear at S.F. Trial, Volume 4, voir dire examination of Ramon Luna, at pp. 15-39; S.F. Trial, Volume 5, voir dire examination of Darcelle Lott, at pp. 7-40; S.F. Trial, Volume 5, voir dire examination of Mark Hairston, at pp. 120-46; S.F. Trial, Volume 5, voir dire examination of Joan Thomas, at pp. 179-207; S.F. Trial, Volume 6, voir dire examination of Jason Olivarri, at pp. 31-41; S.F. Trial, Volume 6, voir dire examination of Robert Gonzalez, at pp. 67-96 (accepted at S.F. Trial, Volume 8, at p. 197); S.F. Trial, Volume 6, voir dire examination of Monique Medina, at pp. 136-66; S.F. Trial, Volume 7, voir dire examination of Griselda Tamez, at pp. 4-26; S.F. Trial, Volume 8, voir dire examination of Roland Bazan, at pp. 28-54; S.F. Trial, Volume 9, voir dire examination of Rodrigo Rodriguez, at pp. 80-107; S.F. Trial, Volume 9, voir dire examination of Alison Campbell-Davies, at pp. 163-91; S/F. Trial, Volume 10, voir dire examination of Christine Avery, at pp. 34-63.

individual mitigating factor unanimously." *Smith v. Spisak*, 558 U.S. at 148 ("Neither the instructions nor the forms said anything about how—or even whether—the jury should make individual determinations that each particular mitigating circumstance existed. They focused only on the overall balancing question. And the instructions repeatedly told the jury to 'conside[r] all of the relevant evidence.'").

In contrast to the jury instructions and verdict form in *Mills*, and consistent with the jury instructions in *Spisak*, Petitioner's jury was not informed that it was required to unanimously agree upon any particular mitigating circumstance or any particular mitigating evidence before it could answer the mitigation special issue affirmatively. Thus, even without the punishment phase jury instruction called for by Article 37.071, §2(f)(3) of the Texas Code of Criminal Procedure, the constitutional error present in *Mills* was absent from Petitioner's capital sentencing trial, just as it was absent from the capital sentencing trial in *Spisak*.

Petitioner's reliance on the Supreme Court's holdings in *Mills* and *McKoy* is also misplaced because those opinions addressed capital sentencing systems vastly different from the one employed in Texas at the time of Petitioner's capital murder trial.[40] See *Hughes v. Johnson*, 191 F.3d 607, 628-

---

[40] As this Court has previously noted, unlike Maryland at the time of *Mills'* trial, Texas is not a weighing jurisdiction. *See Garza v. Thaler*, 909 F.Supp.2d 578, 667 (W.D. Tex. 2012) ("Texas is not a 'weighing jurisdiction' where capital sentencing jurors must balance 'aggravating' versus 'mitigating' factors before rendering a verdict at the punishment phase of a capital trial."), *CoA denied*, 738 F.3d 669 (5th Cir. 2013), *cert. denied*, ___ U.S. ___, 134 S. Ct. 2876, 189 L. Ed. 2d 839 (2014). This Court has also noted the purpose of the Texas capital sentencing system's mitigation special issue is very different from the types of jury determinations made necessary in weighing jurisdictions such as Maryland at the time of *Mills'* trial. "The Texas capital sentencing scheme's 'mitigation' Special Issue serves not to render the defendant eligible for the death penalty or to 'select' the defendant for execution; rather, it allows the capital sentencing jury unfettered discretion to dispense an act of grace to the otherwise condemned defendant." *Hernandez v. Thaler*, 2011 WL 4437091, 54 (W.D. Tex. Sept. 23, 2011), *modified on reh'g*, 2012 WL 394597 (W.D. Tex. Feb. g, 2012), *aff'd*, 537 F. App'x 531 (5th Cir. Aug. 2, 2013), *cert. denied*, ___ U.S. ___, 134 S. Ct. 1760, 188 L. Ed. 2d 597 (2014). Nothing in Petitioner's punishment phase jury instructions, jury verdict forms, or any of the parties' jury arguments suggested or implied that any juror was precluded from giving mitigating effect to any evidence then before the jury, regardless of whether the entire jury unanimously agreed the particular evidence should be viewed as "mitigating" within the meaning of Texas, i.e., reducing or diminishing the defendant's moral blameworthiness.

29 (5th Cir. 1999) (holding both *Mills* and *McKoy* inapplicable to the Texas capital sentencing scheme), *cert. denied*, 528 U.S. 1145 (2000); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994) ("Under the Texas system, all jurors can take into account any mitigating circumstance.  One juror cannot preclude the entire jury from considering a mitigating circumstance.  Thus, *Mills* is inapplicable."), *cert. denied*, 513 U.S. 1067 (1995).

The Texas Court of Criminal Appeals' rejection on the merits in the course of Petitioner's direct appeal of Petitioner's complaint about the absence from his punishment phase jury instructions of the admonition contained in Article 37.071, §2(f)(3) of the Texas Code of Criminal Procedure was neither contrary to, nor involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial court and direct appeal proceedings.  *Smith v. Spisak*, 558 U.S. at 148-49.  Petitioner's fourth claim in his second amended federal habeas corpus petition does not warrant federal habeas corpus relief.

## VI. Ineffective Assistance of Trial Counsel

A.    The Complaints

In his fifth and final claim for relief in his second amended petition, Petitioner argues his trial counsel rendered ineffective assistance in connection with the punishment phase of  Petitioner's capital murder trial by (1) failing to conduct a reasonable sentencing investigation, i.e., an adequate investigation into Petitioner's background, (2) failing to present available mitigating evidence showing (a) Petitioner's father's murder and the rape of Petitioner's sister had a devastating effect and caused him to become suicidal, (b) Petitioner's mother created dangerous living conditions for Petitioner and his siblings, (c) the abandonment of Petitioner by his mother had a damaging

59

psychological effect on Petitioner, and (d) because of his early childhood trauma, Petitioner suffers from severe, complex, posttraumatic stress disorder ("PTSD"), and (3) failing to object to the absence of a punishment phase jury instruction informing the jurors they need not unanimously agree upon what particular mitigating evidence warranted an affirmative answer to the mitigation special issue.[41]

B.      State Court Disposition

        As explained above, Petitioner's state habeas corpus application included complaints that his trial counsel rendered ineffective assistance by (1) failing to request a jury instruction at the punishment phase of trial pursuant to Article 37.071, §2(f)(3) of the Texas Code of Criminal Procedure informing the jurors they need not unanimously agree on which mitigating evidence warranted a finding favorable to the defense on the mitigation special issue, (2) failing to request a jury instruction at the guilt-innocence phase of trial on the lesser-included offense of felony murder, (3) failing to investigate whether the fatal bullet went through Patel's hand and ricocheted off the floor before striking Patel in the chest, (4) failing to have a forensic expert examine the fatal bullet to see if it passed through Patel's hand before striking the floor and then entering Patel's chest, (5) failing to voir dire the jury venire on the difference between capital murder and felony murder, (6) failing to challenge the legality of petitioner's arrest, (7) failing to object to the admission of evidence defense counsel had previously contested, and (8) failing to investigate possible mitigating evidence, including evidence showing Petitioner suffered from Attention Deficit Disorder, asthma,

---

[41] *Second Amended Petition*, at pp. 40-65.

dyslexia, the effects of post-traumatic stress disorder, and organic brain damage due to prolonged drug abuse.[42]

The state trial court (1) concluded Petitioner was not prejudiced by his trial counsels' failure to request a jury instruction in accordance with Article 37.071, §2(f)(3), i.e., an instruction advising the jury it need not unanimously agree on which evidence warranted an affirmative finding on the mitigation special issue because the Texas Court of Criminal Appeals concluded on direct appeal this error was harmless in Petitioner's case, (2) found Petitioner had presented no new mitigating evidence not previously submitted to Petitioner's jury at the punishment phase of his trial, (3) concluded Petitioner's complaint about his trial counsel's allegedly deficient investigation and presentation of mitigating evidence failed to satisfy the prejudice prong of *Strickland* analysis, and (4) recommended denial of Petitioner's ineffective assistance claims.[43]  The Texas Court of Criminal Appeals accepted the findings and conclusions of the trial court and denied Petitioner's state habeas corpus application.  *Ex parte Christopher Anthony Young*, WR-70,315-01, 2013 WL 2446428, *1 (Tex. Crim. App. June 5, 2013).

C.   The Constitutional Standard

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U.S. 15, 16-17 (2009); *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

---

[42] State Habeas Transcript, at pp. 11-35, 51-86.

[43] State Habeas Transcript, at pp. 394-405, 407-15.

would have been different (*Porter v. McCollum*, 558 U.S. 30, 38-40 (2009); *Wong v. Belmontes*, 558 U.S. at 19-20).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best

to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. at 7; *Strickland v. Washington*, 466 U.S. at 688-89.  It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  *Strickland v. Washington*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different.  *Wiggins v. Smith*, 539 U.S. at 534; *Strickland v. Washington*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.  *Strickland v. Washington*, 466 U.S. at 694.

In evaluating Petitioner's complaints about the performance of his counsel under the AEDPA, i.e., those complaints which the state courts have addressed on the merits, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded Petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis.  *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004).  In making this determination, this Court must consider the underlying *Strickland* standard.  *Id.*  In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is *de novo.  See Porter v. McCollum*, 558 U.S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390  (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts

rested their rejection of an ineffective assistance claim on the deficient performance prong and never

addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534.

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective

assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d 483, 489

(5th Cir. 2009), *cert. denied*, 558 U.S. 839 (2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th

Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009).   Under the well-settled *Strickland* standard, the

Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made

all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S.

685, 698 (2002); *Strickland v. Washington*, 466 U.S. at 690.

D.    Procedural Default & *De Novo* Review of Unexhausted Ineffective Assistance Complaints

Petitioner has failed to exhaust available state remedies with regard to complaints that his

trial counsel rendered ineffective assistance by failing to present available mitigating evidence

showing (1) Petitioner's mother created dangerous living conditions for Petitioner and his siblings,

(2) the abandonment of Petitioner by his mother had a damaging psychological effect on Petitioner,

and (3) because of his early childhood trauma, Petitioner suffers from severe, complex, posttraumatic

stress disorder ("PTSD").   Petitioner procedurally defaulted on these unexhausted complaints of

ineffective assistance. *See Beatty v. Stephens*, 759 F.3d 455, 465 (5th Cir. 2014) (Texas petitioner

who failed to raise complaint of ineffective assistance by his trial counsel during his first state habeas

corpus proceeding would be precluded under Article 11.071, §5 from returning to state court to

litigate same claim and procedurally defaulted on claim in federal habeas corpus proceeding), *cert.*

*denied*, ___ U.S. ___, 135 S. Ct. 2312, ___ L. Ed. 2d ___ (2015); *Trottie v. Stephens*, 720 F.3d 231,

248 (5th Cir. 2013) (holding petitioner's failure to fairly present factual basis underlying an

ineffective assistance complaint in his state habeas corpus action rendered same ineffective assistance complaint unexhausted and procedurally defaulted), *cert. denied*, ___ U.S. ___, 134 S. Ct. 1540, 188 L. Ed. 2d 562 (2014).

Petitioner cannot satisfy either of the exceptions to the procedural default doctrine because, as explained below, even under *de novo* review. Petitioner's unexhausted ineffective assistance complaints do not satisfy the prejudice prong of the *Strickland* analysis. *See Johnson v. Cain*, 712 F.3d 227, 234 (5th Cir.) ("Where, as here, 'a prisoner fails to exhaust state remedies and the court to which the prisoner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred due to the prisoner's own procedural default,' we are barred from reviewing those claims unless the petitioner 'demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice.'"), *cert. denied*, ___ U.S. ___, 134 S. Ct. 431, 187 L. Ed. 2d 290 (2013). Likewise, Petitioner's unexhausted ineffective assistance claims are not entitled to merits review from this Court under the rule announced in *Martinez v. Ryan* and *Trevino v. Thaler* because Petitioner's unexhausted ineffective assistance claims are insubstantial, i.e., they lack merit. *See Beatty v. Stephens*, 759 F.3d at 465-66 ("To succeed in establishing cause under *Trevino* and *Martinez,* the petitioner must show: (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (i.e., 'has some merit'); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application.).

Because no state court has addressed the Petitioner's unexhausted ineffective assistance claims, this Court's review of same is necessarily *de novo*. *Porter v. McCollum*, 558 U.S. at 39;

*Rompilla v. Beard*, 545 U.S. at 390, 125; *Wiggins v. Smith*, 539 U.S. at 534.  Even under a *de novo* standard of review, however, this Court may not consider the juror affidavits submitted by Petitioner in support of his unexhausted ineffective assistance claims.  *Tanner v. United States*, 483 U.S. at 120-25; *Summers v. Dretke*, 431 F.3d at 873.

      1.    No Deficient Performance

An analysis of Petitioner's unexhausted ineffective assistance complaints begins with recognition that Petitioner's trial counsel presented a substantial amount of mitigating evidence during the punishment phase of Petitioner's capital murder trial showing, among other things, (1) Petitioner experienced multiple childhood traumas, including the unsolved murder of Petitioner's father, sexual assaults upon his older sister, and a generally unstable family life, (2) Petitioner's childhood traumas were the causes of Petitioner's substance abuse and propensity for violence as an adult, (3) Petitioner nonetheless possessed good character traits, and (4) Petitioner felt sincere remorse over having murdered Patel.[44]  Petitioner's trial counsel did present substantial evidence in the form of testimony from Petitioner's family members (particularly Petitioner's aunt Velina Thomas and mother Dannetta Johnson) and a pair of mental health experts (Dr. Kern and Dr. Skop) showing Petitioner had been traumatized at an early age by his father's murder and his sister's sexual assault and those traumas led to Petitioner becoming bitter, frustrated, angry, withdrawn, uncommunicative, at times violent, and abusive of alcohol and drugs.[45]  Put another way, Petitioner's trial counsel presented a substantial case in mitigation clearly designed to humanize Petitioner, show

---

[44] *See* notes 4-11, *supra*, and accompanying text.

[45] *Id.*

66

Petitioner in as sympathetic a light as possible, and show, as Petitioner's grandmother testified at trial, that Petitioner was "not an evil monster."[46]

Petitioner's new witness affidavits from Petitioner's aunt Velina Thomas, childhood friend Randy Simms, grandmother Cherlye Benson, younger sister Charlotte Young, cousin Kanishia Young, and mother Dannetta Johnson offer the same information about the murder of Petitioner's father and the sexual assault of Petitioner's older sister (and the traumatic impact of those events on Petitioner) which Petitioner's trial counsel presented during the punishment phase of Petitioner's trial.[47]   This is not surprising given the fact Mrs. Thomas, Mrs. Benson, and Mrs. Johnson all testified at the punishment phase of Petitioner's capital murder trial.[48]   The only significant new information contained in these new witness affidavits consists of statements that (1) Petitioner's mother engaged in an extra-marital relationship with a man in Milwaukee who molested Petitioner's older sister and physically abused both Petitioner and his mother, (2) Petitioner's mother often left her children at home while she went out to bars and nightclubs, (3) Petitioner told his aunt Velina he witnessed his stepfather molest his older sister, (4) Petitioner told his aunt he heard his mother had something to do with his father's murder, (5) Petitioner was devastated when a boyfriend of his mother broke into their home and stole all the pictures of Petitioner's father, (6) at age fourteen or fifteen, Petitioner made a suicide attempt, (7) Petitioner and his mother had multiple altercations which resulted in Petitioner being arrested and taken to juvenile detention, (8) Petitioner told his younger sister he had witnessed his step-father rape their older sister, (9) Petitioner attempted to

---

[46] S.F. Trial, Volume 17, testimony of Cherlye Benson, at p. 160.

[47] *See Second Amended Petition*, Exhibits F, G, H, I, J, and K.

[48] *See* notes 6-8, *supra*, and accompanying text.

commit suicide when he was around age eleven, (10) the altercations between Petitioner and his mother which resulted in Petitioner's arrest were instigated by his mother, and (11) Petitioner's uncle was sent to prison for murder shortly before Petitioner's father was murdered.

Additionally, Petitioner presents a report from a forensic and clinical psychologist (Dr. John Matthew Fabian) which reports extensive psychological testing was performed on Petitioner and concludes Petitioner suffers from post-traumatic stress disorder ("PTSD") of a severe and complex nature.[49] Dr. Fabian also reports (1) Petitioner's mother's boyfriends were physically abusive toward Petitioner and his mother, (2) Petitioner's mother engaged in many unhealthy and dysfunctional relationships with men, (3) Petitioner felt very angry and resentful after seeing his mother being physically abused by these men, (4) Petitioner joined the Bloods street gang at age eight and began witnessing violence soon thereafter, (5) virtually everyone in Petitioner's family (including his sister, an older brother, his aunts, his uncles, and his cousins) are in the same gang, (6) Petitioner's step-father was scared of Petitioner's biological father because Petitioner's biological father and his family were all gang members, (7) Petitioner witnessed his father and mother fight together a lot and both would start fights, (8) Petitioner stated he never saw or heard anything about the sexual abuse of his older sister by his step-father until after his step-father went away to prison and his aunt Velina told Petitioner what happened, (9) starting around age six, Petitioner was sexually abused by an older

---

[49] *See Second Amended Petition*, Exhibit L, Report of Dr. John Matthew Fabian (henceforth "Dr. Fabian's Report"), at pp. 14-23.

Dr. Fabian also concluded (1) Petitioner's PTSD resulted from Petitioner suffering the loss of his father at an early age, a history of neglect and abuse by his mother, chronic and intense gang activity within his family, (2) Petitioner's PTSD is characterized by antisocial behavior, verbal and physical aggressiveness towards people or objects, reckless and self-destructive behavior combined with difficulty processing his emotions, significant alcohol and substance abuse, and increased stress reactivity as well as anger and impulsiveness, (3) Petitioner lacks empathy for others, (4) there is little chance Petitioner will ever escape from his chronic PTSD, (5) youth who have been victimized by abuse or violence have been found to be more likely to recidivate than other youth, and (6) Petitioner "was exposed to an extreme combination of early, intense, severe, and frequent traumatic experiences and conditions that placed him at risk for attachment deficits, substance abuse, depression, and antisocial behavior." *Id.*, at pp. 19-23.

sister of a friend who served as a babysitter for Petitioner and his friend, (10) Petitioner denied any history of learning disability, (11) Petitioner witnessed his Uncle Michael's gunshot wound and "thought it was so cool", (12) Petitioner engaged in "countless experiences and incidences of street fights," (13) Petitioner was stabbed twice around age fourteen, (14) Petitioner has been shot at at least twenty times, (15) Petitioner worked from ages 14 to 21 selling drugs while his friends ran a detail shop, (16) Petitioner also dealt drugs out of his grandmother's house when he lived with her, (17) Petitioner felt numb and emotionally cut off from others following his father's murder and was unable to process his emotions following this loss, (18) Petitioner has a lot of problems with anger, (19) Petitioner tried to kill himself when he was nine or ten, (20) Petitioner is an alcoholic who also uses marihuana to deal with his feelings of depression, low self-esteem, paranoia, fear, helplessness, humiliation, anger, and pessimistic world view, (21) Petitioner exhibits antisocial behavior but an above-average IQ, and (22) Petitioner began selling crack cocaine around age thirteen.[50]

Viewed collectively, Dr. Fabian's report and the new witness affidavits present a wealth of double-edged evidence which, while possibly furnishing an explanation for Petitioner's extremely violent behavior, also paint a portrait of Petitioner as the product of an extremely violent, gang-dominated, culture in which Petitioner was exposed to violence long before his father's murder or his sister's sexual assault.  Petitioner admired the members of his family who participated in gang violence, and Petitioner dealt drugs beginning at age thirteen, even while residing with his grandparents.  As the product of such a violent, crime-dominated, environment, Petitioner's jury could well have construed the vast majority of this new evidence as supporting an affirmative answer to the Texas capital sentencing scheme's future dangerousness special issue.  Furthermore, insofar

---

[50] *See* Dr. Fabian's Report, at pp.1-19

as the new evidence tends to identify Petitioner's mother as a major culprit in the deficient nurturing of Petitioner, such evidence would necessarily have undermined the credibility and effectiveness of Mrs. Johnson when she testified at the punishment phase of Petitioner's capital murder trial as the sole defense witness who asserted Petitioner had expressed sincere remorse over his murder of Patel. Thus, there are objectively reasonable bases for believing the new evidence presented by Petitioner in support of his unexhausted ineffective assistance claims would have been significantly less efficacious in terms of eliciting a favorable jury answer to the Texas capital special issues than the case in mitigation actually presented by Petitioner's trial counsel.

Furthermore, at least some aspects of this new evidence could have undermined the factual underpinnings of Dr. Kern's and Dr. Skop's expert testimony at trial.  Specifically, Dr. Skop testified without contradiction at trial that he reviewed the report of Dr. Kern and relied upon same as part of his evaluation of Petitioner.[51]  According to Dr. Kern, who also testified at Petitioner's trial, when he evaluated Petitioner at age fifteen, Petitioner gave no history of sexual abuse.[52]  Yet Dr. Fabian reported that, when he evaluated Petitioner in May, 2014, Petitioner gave a very different story, recounting an extensive history of sexual abuse by a babysitter beginning when he was age six.[53]

There are also dramatic inconsistencies between the information Petitioner apparently gave Dr. Kern (upon which Dr. Skop relied) and the information Petitioner furnished to Dr. Fabian regarding his history of suicidal ideation and suicide attempts.  Dr. Kern testified at trial that, while Petitioner admitted he had experienced suicidal ideation following his father's murder, he stated he

---

[51] S.F. Trial, Volume 18, testimony of Dr. Brian P. Skop, at pp. 25, 31.

[52] S.F. Trial, Volume 18, testimony of Dr. Paul A. Kern, at p. 18.

[53] Dr. Fabian's Report, at pp. 5, 19-20.

had never acted upon those thoughts.[54]   In contrast, the new witness affidavits and Dr. Fabian's report assert Petitioner made two unsuccessful suicide attempts, one around age eleven and the other around age fifteen.

While Petitioner's new witness affidavits contain many statements indicating those witnesses had little-to-no communication with Petitioner's trial counsel, those allegations must be viewed in proper context.[55]   At the evidentiary hearing held during Petitioner's state habeas corpus proceeding, both Petitioner's lead trial counsel (attorney Michael Sawyer) and Petitioner's mitigation expert (Linda Tussay) both testified without contradiction that Ms. Tussay was responsible for investigating Petitioner's background, interviewing Petitioner's family, and preparing the defense's punishment phase witnesses.[56]   Significantly, Petitioner has presented this Court with no evidence establishing Petitioner's defense team was unaware of any of the new evidence accompanying Petitioner's second amended petition.[57]   Furthermore, Petitioner's trial counsel may have had objectively reasonable

---

[54] S.F. Trial, Volume 18, testimony of Dr. Paul A. Kern, at pp. 11, 17-18.

[55] Petitioner also presents (as Exhibit E to his second amended petition) an unsigned, unauthenticated, copy of what purports to be a time record, presumably of Ms. Tussay, which show she met with Petitioner on at least four occasions (i.e., October 26, 2005, December 1, 2005, January 12, 2006, and January 19, 2005) prior to trial for apparently a total of twelve hours.  The same records indicate Ms. Tussay met in person or telephonically with Petitioner's family members at least eight times prior to the presentation of the defense's evidence at the punishment phase of Petitioner's trial (i.e., December 1, 2005, December 3, 2005, December 4, 2005, January 17, 2006, January 30, 2006, January 31, 2006, February 2, 2006, and February 5, 2006) for a total of twenty-three hours.

[56] S.F. State Habeas Hearing [found at State Habeas Transcript, at pp. 287-386], testimony of Michael J. Sawyer, at pp. 8-14, 28, 32; testimony of Linda Tussay, at pp. 72-74,82, 84-85, 93.
    Attorney Sawyer testified (1) Ms. Tussay did extensive background investigation into Petitioner's life history and developed evidence showing Petitioner's father's murder and the rape of Petitioner's sister Tasha both had a tremendous impact on Petitioner's development, (2) Petitioner used crack cocaine on the date of the murder, (3) he discussed the possibility of Petitioner testifying at trial and Petitioner chose not to do so, and (4) he discussed the possibility of using post-traumatic stress syndrome as a defense at the guilt-innocence phase of trial but decided it could not be used effectively.  S.F. State Habeas Hearing, testimony of Michael J. Sawyer, at pp. 8-14, 28, 32, 36.  Ms. Tussay testified she helped prepare the defense's punishment phase witnesses.  *Id.*, testimony of Linda Tussay, at p. 85.

[57] For instance, Petitioner presents this Court with no affidavits from either of Petitioner's trial counsel or Petitioner's mitigation specialist stating the Petitioner's defense team was unaware of either (1) Petitioner's gang affiliation and the gang affiliations of Petitioner's family members, (2) the long history of domestic violence set forth

strategic reasons for choosing not to introduce evidence at the punishment phase of Petitioner's capital murder trial which showed Petitioner (1) was emotionally and physically abandoned by his mother, (2) Petitioner was raised amid a culture of gang violence and domestic violence, and (3) Petitioner had been the victim of sexual and physical abuse from an early age.

At the punishment phase of Petitioner's capital murder trial, the jury confronted only two special issues, i.e., the questions whether (1) there was a probability Petitioner would commit criminal acts of violence which constituted a continuing threat to society and (2) taking into consideration all of the evidence, sufficient mitigating circumstances (or a sufficient mitigating circumstance) existed which warranted a life sentence for Petitioner.[58]

Petitioner's trial counsel attempted, albeit unsuccessfully, to elicit answers from the jury favorable to defendant on both those special issues by presenting evidence showing, among other things, that (1) Petitioner's mother, aunt, and grandmother all still loved Petitioner despite his commission of Patel's murder, (2) Petitioner's family members were "shocked" when they learned of Petitioner's offense, (3) Petitioner was a fairly normal eight year old until his father was brutally murdered and his older sister was sexually assaulted, (4) as a result of comments by others at school after his father's death, Petitioner began displaying anger and lost interest in attending school, (5) it was the traumatic experiences Petitioner suffered around age eight which caused Petitioner to withdraw emotionally from his family and become angry, (6) Petitioner been employed gainfully for many years and managed his money, and (7) Petitioner was a good boyfriend to at least one of the

---

in the new witness affidavits, or (3) the evidence allegedly showing Petitioner's emotional and physical abandonment by his mother.

[58] *See* note 34, *supra*, and accompanying text.

mothers of his daughters and loved both his daughters.[59]  Petitioner's trial counsel thereby attempted to humanize Petitioner, explain Petitioner's violent outbursts, and show Petitioner was worthy of redemption from a sentence of death.

Presentation at trial of the "new mitigating evidence" proffered by Petitioner in the witness affidavits and report of Dr. Fabian attached to Petitioner's second amended petition would have dramatically reduced the potential efficacy of Petitioner's actual case in mitigation by (1) presenting a host of new information (including Petitioner's gang membership, extensive history of drug-dealing, the active gang membership of Petitioner's family, and Petitioner's childhood exposure to a wide range of violence - both within his home and within his community)  showing many forces which underlay Petitioner's propensity for violence existed separate and apart from the traumatic influences of his father's murder and his sister's sexual assault, (2) undermining the factual information underlying Dr. Kern's and Dr. Skop's expert opinions (by suggesting alternative reasons for Petitioner's descent into a pattern of violence and antisocial behavior), and (3) undermined the credibility and effectiveness of the lone defense witness (i.e., Petitioner's mother) who testified at trial that Petitioner was sincerely remorseful for having killed Patel.  Petitioner's trial counsel could reasonably have concluded a trial strategy focused on (1) humanizing Petitioner, (2) showing Petitioner to be remorseful, and (3) showing Petitioner's troubles at school and propensity for violence resulted from the tragic murder of Petitioner's father and the sexual assaults upon Petitioner's older sister (rather than Petitioner's gang affiliation and exposure to a long history of domestic and gang violence) was superior to presenting the type of double-edged "new evidence" contained in Dr. Fabian's report and the new witness affidavits accompanying Petitioner's second

---

[59] *See* notes 4-11, *supra*, and accompanying text.

amended petition.  Having independently reviewed the entire record from Petitioner's trial, direct appeal, and state habeas corpus proceedings and all of the admissible new evidence accompanying Petitioner's second amended petition, this Court concludes Petitioner's unexhausted ineffective assistance claims all fail to satisfy the deficient performance prong of the *Strickland* analysis.  This Court finds Petitioner's defense team (1) did conduct an objectively reasonable investigation (through its mitigation expert) into Petitioner's background, (2) identified and presented significant potentially mitigating evidence at trial designed to humanize Petitioner and explain Petitioner's propensity for violence as an adult resulted from Petitioner's childhood traumas (i.e., the unsolved murder of Petitioner's father's, the multiple sexual assaults upon Petitioner's older sister, and Petitioner's difficult, unstable childhood), and (3) presented evidence showing Petitioner felt sincere remorse over having murdered Patel.  In so doing, the performance of Petitioner's trial counsel did not fall below an objective level of reasonableness.

2.    No Prejudice

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course).  *Wong v. Belmontes*, 558 U.S. at 20; *Wiggins v. Smith*, 539 U.S. at 534.  *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong v. Belmontes*, 558 U.S. at 27.  The prejudice inquiry under *Strickland* requires evaluating whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "The likelihood of a

different result must be substantial, not just conceivable." *Brown v. Thaler*, 684 F. 3d 482, 491 (5th Cir. 2012)(*citing Harrington v. Richter*, 562 U.S. 86 (2011)), *cert. denied*, ___ U.S. ___, 133 S. Ct. 1244, 185 L. Ed. 2d 190 (2013).

"To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler,* 601 F.3d 347, 352 (5th Cir.), *cert. denied*, 562 U.S. 911 (2010). "An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Id.*

Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a law witness or an expert witness) satisfy  the prejudice prong of *Strickland* analysis only by naming the witness, *demonstrating the witness was available to testify and would have done so*, setting out the content of the witness' proposed testimony, and showing the testimony would have been favorable to a particular defense. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

As explained above, the bulk of the new evidence presented by Petitioner in support of his second amended petition is repetitive of the testimony presented during the punishment phase of Petitioner's capital murder trial, i.e., the evidence of Petitioner's negative reaction to his father's murder and his older sister's sexual assault by his step-father.  Petitioner's new evidence adds very little to the trial testimony of Petitioner's mother, grandmother, aunt, and Dr. Skop on these

subjects.[60]  Insofar as Petitioner's new evidence establishes Petitioner was exposed to extensive violence prior to his father's murder (through Petitioner witnessing his parents starting fights and other incidents of gang violence and domestic violence),[61] Petitioner's new evidence undermines the fundamental premise of Petitioner's actual mitigation case at trial, i.e., that Petitioner had a fairly normal childhood until he suffered the trauma of his father's murder and his sister's sexual assault just months apart.  Likewise, Dr. Fabian's documentation of Petitioner's gang membership, the gang violence in which Petitioner's family was engaged, and the Petitioner's expressed fascination with violence, Petitioner's new evidence undermines the thrust of the case in mitigation presented by Petitioner's defense team during the punishment phase of Petitioner's trial.[62]   Dr. Fabian's

---

[60] The new witness statement of Petitioner's aunt Velina Thomas (*Second Amended Petition*, Exhibit F) states that years after the fact, Petitioner told her he had seen Clarence Franklin molest his older sister Tasha when he was eight years old.  The new witness statement of Petitioner's cousin Kanishia Young (*Second Amended Petition,* Exhibit J) states that Petitioner told her he had witnessed Clarence Franklin raping his older sister Tasha.  These statements are inconsistent with Dr. Fabian's Report, which states, in pertinent part, that Petitioner informed Dr. Fabian he did not understand until much later why his step-father had been taken away:

> He went to prison and my mom never said a word about it.  I never talked to my sister about it.  I just remember him leaving home one day and the cops being at the house.  I later heard that the sexual abuse was ongoing behavior between my step-father towards my sister.  I never saw or heard the abuse going on and I never talked to my sister about it.  My Aunt Velina told me later what had happened and that my step-father raped Tasha and got her pregnant.  I remember my aunt telling me this when I was about 8.

Dr. Fabian's Report, at p. 5.

[61] Dr. Fabian reports Petitioner (1) witnessed frequent fights between his biological father and mother, (2) said both his parents would start the fights, and (3) described his mother as being "very physical in nature both with him and within her relationships with men."  *Dr. Fabian's Report,* at p. 4.

[62] Dr. Fabian's Report states, in part, as follows:

> During the evaluation, Chris stated he was a member of the Blood Stone Villain Gang which is associated with the Bloods.  He stated, "My Aunt Velina stayed in the apartment complex.  She and my uncle Michael were gang members.  I wanted to be with my uncle who was a top Blood in San Antonio and he is in the Stiles Unit in the Texas Department of Criminal Justice.  He got a 50 year sentence for murder.  He killed another Crip gang member with his hands in the street.  My uncle was a big time Blood in San Antonio.  My aunt was a Blood too," Chris stated a number of his family members were affiliated with the Bloods Gang.  He said, "The rest of my uncles and aunts were affiliated.  My sister and older brother and cousins were all members of the Bloods."

> Chris stated he was initiated into the Bloods Gang at age 8.  His first gang related activity was at age 12.  He reported, "I got my ass kicked and beat up at age 8.  The whole apartment complex where we were living at the Olive Park East Apartments were in gangs.  Everyone was in the gangs.

documentation of Petitioner's long history of dealing crack cocaine undermines the efforts of Petitioner's defense team to present evidence at trial showing Petitioner had been gainfully employed during his teen years.[63]   In sum, Dr. Fabian's report contains a great deal of new information which would have proven highly detrimental to the efforts of Petitioner's trial counsel to obtain answers to the Texas capital sentencing special issues favorable to the defense.   Instead, of portraying Petitioner as the innocent victim of childhood traumas (as Petitioner's trial counsel attempted to show through testimony from Petitioner's family members and Dr. Skop), Petitioner's new evidence paints a portrait of Petitioner as a childhood gang member fascinated by violence (prior to the murder

---

My aunt and uncle had gang members to their home,  They all drank alcohol and smoked marijuana and I know they were all Bloods.  We wanted to be like them when we were growing up.  Everyone idealized the Bloods."

When I asked Chris more about community violence he was exposed to he stated he had seen significant violence through his association with the Bloods gang and also while living in the projects. He recalled, "I remember seeing my Uncle Michael the day after he was shot when I was 8.  He showed me the gunshot wound and he was shot in the shoulder and he was all bandaged up and I knew he was shot by a Crip and I thought it was so cool.  He told me that the Crabs [sic] caught me sleeping. I thought this was so cool that he was shot in the street.  I have seen people get stomped out and have seen people get their ass beat.  I remember when I was about 8 I started seeing violence.  I remember when I was 9 I went to a Crip school.  I would have fights with Crips every day.  We also used to play sports together and we would play but then say that we would see each other later and then get into fights."  Chris reported countless experiences and incidences of street fights.

Dr. Fabian's Report, at pp. 8-9.

Petitioner also reported to Dr. Fabian that (1) he had a friend who was shot and killed by a rival gang member, (2) he had lost other close friends who were murdered in gang related street violence, (3) he had witnessed violence toward others including family members, and he had seen a man in front of his car get shot and his chest was shot up. *Id.*, at p. 19.

[63] Dr. Fabian reported Petitioner's history of drug dealing as follows:

Chris stated that he trafficked drugs on a regular basis beginning around age 13 and he was selling crack cocaine.  He recalled being kicked out of the house once and stated that his mother's boyfriend who was living with the family was a 'crack head.'  He said she was very upset at him and kicked him out of the house and later she found out that he was using drugs.  He said that he had sold his mother's boyfriend crack cocaine.  He reported that he learned how to deal crack cocaine at age 13, "My friends dealt drugs.  My uncle knew a woman that he dated and her son was a drug dealer in San Antonio.  I hung with his crew of friends and he taught me how to deal crack.  I learned how to make money and learned how to deal crack when I was 15.  I did not use crack but I dealt it.  I was also dealing marijuana."

Dr. Fabian's Report, at pp. 13-14.

of his father) who grew up to be a violent drug dealer.  While some aspects of this new evidence might have rendered Petitioner more sympathetic in the eyes of some jurors, it is equally possible, if not probable, this new evidence would (1) have all but guaranteed an affirmative answer by the jury to the future dangerousness special issue by convincing the jury Petitioner was the product of a culture of gang violence and drug dealing and (2) reduced the degree of sympathy the jury felt toward Petitioner by (a) reducing the efficacy of Dr. Skop's expert trial testimony which identified the death of Petitioner's father and the sexual assault of Petitioner's sister as the triggers for Petitioner's history of violence and (b) undermining the credibility and effectiveness of two of the key witnesses Petitioner's defense team utilized at trial in their attempt to humanize Petitioner, i.e., Petitioner's mother (the only defense witness who stated Petitioner felt remorse over Patel's murder) and aunt Velina (whom Petitioner apparently identified to Dr. Fabian as a gang member and drug abuser).

During the punishment phase the prosecution presented the testimony of Chala Riley and Daphne Edwards, as well as evidence showing Petitioner had a lengthy criminal history for violent conduct, both as a juvenile and an adult.[64]  Having independently reviewed the entire record from Petitioner's trial, direct appeal, and state habeas corpus proceeding, this Court concludes there is no reasonable probability that, but for the failure of Petitioner's trial counsel to present the jury with any of the double-edged new evidence submitted in support of Petitioner's second amended petition, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different. In fact, had the prosecution been aware at the time of trial of the new evidence concerning Petitioner's gang activity, fascination with violence, and long history of drug dealing detailed in Dr.

---

[64] *See* note 3, *supra*, and accompanying text.

Fabian's report, the prosecution would likely have introduced that same evidence as part of its case in chief at the punishment phase of Petitioner's trial.

      3.    <u>Conclusions</u>

Petitioner's procedurally defaulted unexhausted ineffective assistance claims fail to satisfy either prong of the *Strickland* analysis, do not satisfy either of the exceptions to the procedural default doctrine, and do not present a substantial claim of ineffective assistance by Petitioner's trial counsel.  Thus, Petitioner's state habeas counsel did not render ineffective assistance in failing to present the state habeas court with the same new evidence Petitioner has presented in support of his second amended petition.  Petitioner's unexhausted ineffective assistance claims do not warrant federal habeas corpus relief.

**E.**     <u>AEDPA Review of Exhausted Ineffective Assistance Claims</u>

The state trial court concluded Petitioner's complaints about his trial counsels' failure to (1) object to the absence of a jury instruction informing the jury it need not unanimously agree on which evidence supported an affirmative finding on the mitigation special issue and (2) conduct a more thorough investigation into Petitioner's background and present additional mitigating evidence both failed to satisfy the prejudice prong of the *Strickland* analysis.  The Texas Court of Criminal Appeals accepted those conclusions and denied state habeas corpus relief.

This Court is precluded from considering any of the new evidence Petitioner has presented in support of his exhausted ineffective assistance claims.  *See Cullen v. Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1401 (holding a federal habeas petitioner is not entitled to present new evidence supporting a claim in federal court when the state court has ruled on the merits of the underlying claim); *Loden v. McCarty*, 778 F.3d at 493 ("When, as here, a habeas petitioner's claim has been

adjudicated on the merits in state court, 'review under § 2254(d)(1) is limited to the record that was before the state court.'"); *Woodfox v. Cain*, 772 F.3d at 368 ("The Supreme Court has clarified that when a claim is adjudicated on the merits, for the purposes of review under § 2254(d)(1), the record is limited to the one before the state court, even if the state court issued a summary affirmance.").

When, as here, a state court has rejected a claim of ineffective assistance on the merits, under the AEDPA, a federal habeas court's review of that ruling is also highly deferential:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsels performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams, supra,* at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance,* 556 U.S. 111, 122, 129 S.Ct. 1411, 1413–14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

*Harrington v. Richter*, 562 U.S. at 101.

For the reasons set forth at length in Section V above, the Texas Court of Criminal Appeals reasonably concluded Petitioner was not prejudiced by the absence from Petitioner's punishment phase jury instructions of the admonition required by Article 37.071, §2(f)(3) of the Texas Code of Criminal Procedure. Petitioner's jury unanimously concluded there were no mitigating circumstances (and no mitigating circumstance) sufficient to warrant imposition of a life sentence

in Petitioner's case.  Nothing in Petitioner's punishment phase jury instructions or punishment phase verdict form advised Petitioner's jury it was required to unanimously agree upon which evidence supported an affirmative answer to the mitigation special issue.  Thus, the constitutional error in *Mills* was not present at Petitioner's trial.  Nor could Petitioner's jury have reasonably construed any of the jury arguments or voir dire examination they received as suggesting a need for unanimity on specific mitigating evidence before the jury could render an affirmative finding on the mitigation special issue.  The state habeas court reasonably concluded this complaint failed to satisfy the prejudice prong of *Strickland* analysis.  *Smith v. Spisak*, 558 U.S. at 148-49.

Having independently reviewed the record from Petitioner's trial and state habeas corpus proceeding, this Court also finds, as did the state habeas trial court, that Petitioner presented no new mitigating evidence in support of his *Wiggins* claim in his state habeas corpus proceeding.[65]  Given the absence of any truly new mitigating evidence before the state habeas trial court, the Texas Court of Criminal Appeals reasonably concluded Petitioner's complaints about the alleged failure of his trial counsel to adequately investigate Petitioner's background and present available mitigating evidence failed to satisfy the prejudice prong of the *Strickland* analysis.  During his state habeas corpus proceeding, Petitioner failed to present any evidence showing there was any new or additional mitigating evidence available at the time of his trial which his trial counsel failed to identify and present at trial.  Petitioner thereby failed to satisfy the prejudice prong of the *Strickland* analysis. See *Gregory v. Thaler,* 601 F.3d at 352 ("An applicant 'who alleges a failure to investigate on the

---

[65] *Compare* the extensive case in mitigating presented by Petitioner's trial counsel summarized at *notes* 4-11, *supra*, and accompanying text with the testimony furnished during Petitioner's state habeas corpus proceeding summarized in *note* 16, supra.  The state trial court accurately concluded Petitioner's state habeas counsel presented the trial court with no mitigating evidence that was truly new.

part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'").

The Texas Court of Criminal Appeals' rejections on the merits of Petitioner's ineffective assistance complaints premised upon (1) the absence of an Article 37.071, §2(f)(3) jury instruction, and (2) the scope of Petitioner's trial counsels' investigation into Petitioner's background and the mitigation evidence the defense team actually presented during the punishment phase of Petitioner's capital murder trial were neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States nor based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial court and state habeas corpus proceedings. Petitioner's exhausted ineffective assistance claims do not warrant federal habeas corpus relief.

## VII. Request for an Evidentiary Hearing

Petitioner has requested an evidentiary hearing to permit more factual development of his claims herein. Under the AEDPA, the proper place for development of the facts supporting a claim is the state court. *See Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir.) (holding the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court), *cert. denied*, 522 U.S. 984 (1997). Furthermore, where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1398-1400 (holding an evidentiary hearing is unnecessary when a state court has rejected a claim on the merits and federal habeas review of that rejection is governed by §2254(d)(1)). Thus, Petitioner is not entitled to a federal evidentiary hearing on any of his claims herein which were rejected on the

merits by the state courts, either on direct appeal or during Petitioner's state habeas corpus proceeding.  *See Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014) ("The Supreme Court has clarified that when a claim is adjudicated on the merits, for the purposes of review under § 2254(d)(1), the record is limited to the one before the state court, even if the state court issued a summary affirmance."), *cert. filed*, *April 27, 2015, no.* 14-1288).

Likewise, where a federal habeas corpus petitioner's claims lack merit on their face, further factual development is not necessitated.  *See Register v. Thaler*, 681 F.3d 623, 627-30 (5th Cir. 2012) (recognizing District Courts possess discretion regarding whether to allow factual development, especially when confronted with claims foreclosed by applicable legal authority).  "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court."  *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009) (quoting *Schriro v. Landrigan,* 550 U.S.465, 468 (2007)).  "In determining whether to grant a hearing, under Rule 8(a) of the habeas Court Rules 'the judge must review the answer [and] any transcripts and records of state-court proceedings... to determine whether an evidentiary hearing is warranted.' " *Richards v.* Quarterman, 566 F.3d at 562-63 (*quoting Hall v. Quarterman,* 534 F.3d 365, 368 (5th Cir. 2008) (*in turn quoting Schriro,* 550 U.S. at 473)).  In making this determination, courts must consider whether an evidentiary hearing could "enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Richards v. Quarterman*, 566 F.3d at 563 (*quoting Schriro,* 550 U.S. at 474).

Petitioner's unexhausted first claim for relief herein is not only procedurally defaulted but also barred by the non-retroactivity doctrine of *Teague v. Lane.*  Petitioner's second claim is also

barred by the holding in *Teague*.   In addition to being without merit, Petitioner's third claim is unexhausted and procedurally defaulted.   Petitioner's unexhausted ineffective assistance claims are procedurally defaulted and not "substantial" for purposes of the *Ryan v. Martinez* exception to the procedural doctrine.   Petitioner is not entitled to an evidentiary hearing for the purpose of developing any of his procedurally defaulted or *Teague*-barred claims.

## VIII. Certificate of Appealability

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA.   *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. §2253(c) (2).   Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted.   *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted.   *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; 28 U.S.C. §2253(c) (3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right.   *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).   To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate

to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282; *Miller-El v. Johnson*, 537 U.S. at 336. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338 (*quoting Slack v. McDaniel*, 529 U.S. at 484); *accord Tennard v. Dretke***,** 542 U.S. at 282. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, 558 U.S. 993 (2009); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller-El v. Cockrell*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course.").

Reasonable minds could not disagree with this Court's conclusions that (1) Petitioner's unexhausted first claim herein is procedurally defaulted and barred by the non-retroactivity doctrine of *Teague v. Lane*, (2) Petitioner's second claim was reasonably rejected by the state courts on the merits in a manner fully consistent with clearly established federal law, as well as barred by *Teague*, (3) Petitioner's third claim is unexhausted, procedurally defaulted, and without merit, (4) Petitioner's fourth claim was reasonably rejected by the state appellate court in a manner consistent with clearly established federal law, (5) all of Petitioner's ineffective assistance claims, both his unexhausted and his exhausted complaints, all fail to satisfy the prejudice prong of the *Strickland* analysis, (6) Petitioner's juror affidavits are inadmissible in this federal habeas corpus proceeding for all the purposes for which Petitioner has submitted them for review in this cause, and (7) *Cullen v. Pinholster* precludes this Court from considering Petitioner's new evidence in connection with any of the Petitioner's claims in his second amended petition which the state appellate court or state habeas court rejected on the merits. Petitioner is not entitled to a CoA on either his *Martinez v. Ryan* arguments, his *Strickland* claims, or any of his remaining claims for relief.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in Petitioner's second amended federal habeas corpus petition, filed June 27, 2014 *(ECF no. 39)*, is **DENIED**.

2. Petitioner is **DENIED** a Certificate of Appealability on all claims herein.

3. Petitioner's request for an evidentiary hearing is **DENIED**.

4.  All other pending motions are **DISMISSED AS MOOT**.

SIGNED this 13th day of July, 2015.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE